COMMONWEALTH OF MASSACHUSETTS

4/6/2021

ESSEX, ss.                                               SUPERIOR COURT DEPARTMENT
                                                              OF THE TRIAL COURT

|  |  |
|---|---|
| JOHN B. WILSON, LESLIE WILSON, and JOHN B. WILSON, JR., | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. _____ ) |
| NETFLIX, INC., NETFLIX WORLDWIDE ENTERTAINMENT, LLC, 241C FILMS, LLC, LIBRARY FILMS LLC, JON KARMEN, and CHRIS SMITH, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

RECEIVED

## COMPLAINT AND JURY DEMAND

### i. Introduction

1.      This is an action for defamation brought by Plaintiffs, who are members of the Wilson family.  For the past two years, the Wilson family has endured the unfair prosecution of the father in their family, Plaintiff John B. Wilson ("Mr. Wilson"), in the so-called "Varsity Blues" case pending in federal court in Boston.  Mr. Wilson has pled not guilty in that case.  He did so because he is innocent.  While awaiting his trial, which has been delayed more than two and half years after his initial hearing, the Wilson family has been subjected to multiple instances of unfair and inaccurate reporting about the case.  In recent days, however, they have been forced to endure the ultimate destruction of their reputations in the eyes of more than 200 million global Netflix subscribers as the result of Netflix's March 17, 2021 broadcast, and thereafter the

continuous streaming, of the so-called 'documentary' titled *Operation Varsity Blues: The College Admission Scandal*.

2.      No individual, including a defendant awaiting trial in a criminal case, is required to sit by and permit the unlawful and unfair destruction of their reputation by a global media outlet.  For this reason, prior to Defendant Netflix, Inc. ("Netflix") and the other Defendants named herein airing their publication, the Wilson family literally warned them in writing of the specific, publicly available and fully exculpatory facts surrounding the charges against Mr. Wilson and made clear that Mr. Wilson and his children could not simply be grouped into a narrative about the many individuals who, unlike Mr. Wilson, have pled guilty to committing crimes.  Among other things, the Wilsons made clear to Defendants that Mr. Wilson's son was a real and talented water polo player who was part of the United States Olympic development program, that his daughters had 99th percentile test scores based on tests that they themselves took, and other publicly available exculpatory information, all of which the Wilsons provided to Defendants.

3.      The Wilsons further supplied Defendants with the results of extensive polygraph testing conducted by highly respected and experienced professionals which Mr. Wilson uniformly passed.  Yet, Netflix and the other Defendants knowingly and recklessly ignored those facts and painted the Wilsons with the broadest and dirtiest brush possible.  They included the Wilson family in the broad and sweeping allegations of misconduct made by the government against other "Varsity Blues" defendant parents who have admitted their guilt in court and who are not going to trial.  This presentation is completely contrary to director Christopher Smith's purported claim that he and the other filmmakers "were trying to paint a slightly more complex portrait of the whole landscape as opposed to painting it with one brush."  *See*

https://www.yahoo.com/entertainment/lori-loughlin-felicity-huffman-fbi-transcripts-omitted-operation-varsity-blues-film-director-171730624.html.  Indeed, Mr. Wilson is the only one of the "Varsity Blues" parent defendants featured in the 'documentary' who has not pleaded guilty.  By deliberately blurring the lines between the parents featured in the 'documentary,' by deliberately ignoring publicly available information on the docket in Mr. Wilson's criminal proceeding to which they were specifically directed and with which they were provided, and through defamatory suggestions of fact and innuendo of and concerning the entire Wilson family, the Defendants gave and continue to give viewers the false and defamatory impression that the Wilsons engaged in substantially similar conduct as the other parents and families included in the publication.  The Wilson family members named herein seek monetary damages and other legal redress for the malicious and reckless destruction of their reputations caused by Defendants.

### ii. Parties

4. Mr. Wilson is an individual and a resident of Lynnfield, Essex County, Massachusetts.

5. Plaintiff Leslie Wilson ("Mrs. Wilson") is an individual and a resident of Lynnfield, Essex County, Massachusetts.  She is the wife of Mr. Wilson.

6. Plaintiff John B. Wilson, Jr. ("Johnny Wilson") is an individual and a resident of Los Angeles, California.  He is the son of Mr. Wilson and Mrs. Wilson.

7. Defendant Netflix is a media-services provider and production company that streams media content worldwide to its subscribers.  Upon information and belief, it is a Delaware corporation with a principal place of business in the State of California.

8. Defendant Netflix Worldwide Entertainment, LLC ("Netflix WE") is, upon information and belief, a wholly owned subsidiary of Netflix.  Upon further information and

belief, Netflix WE owns the trademarks and copyrights for the 'documentary' at issue. Upon further information and belief, it is a Delaware limited liability company with a principal place of business in the State of California.

9. Defendant 241C Films, LLC ("241C") is a producer of the 'documentary' at issue. Upon information and belief, 241C is a California limited liability company with a principal place of business in the State of California.

10. Defendant Library Films LLC ("Library Films") is a producer of the 'documentary' at issue. Upon information and belief, Library Films is a California limited liability company with a principal place of business in the State of California.

11. Defendant Jon Karmen ("Karmen") is an individual and, upon information and belief, a resident of the State of California. He is a principal of 241C and Library Films, and the credited producer of the 'documentary'.

12. Defendant Chris Smith ("Smith") is an individual and, upon information and belief, a resident of the State of California. He is a principal of 241C and Library Films, and the credited director of the 'documentary'.

### iii. Jurisdiction and Venue

13. This Court has jurisdiction over this matter pursuant to G.L. c. 212, § 4.

14. Venue is proper in this Court pursuant to G.L. c. 223, § 1, as Mr. and Mrs. Wilson are residents of Essex County.

### iv. **Background**

15.     Mr. Wilson is a defendant in *United States v. Colburn*, 19-cr-10080, a criminal case pending in federal court in Boston which arises from the so-called "Varsity Blues" investigation. Other defendant parents caught up in the investigation include both famous Hollywood individuals as well as other parents.

16.     Unlike these and other high-profile defendant parents who have pleaded guilty, Mr. Wilson is innocent. He was deceived by the confessed felon behind the 'Varsity Blues' scandal, the highly-skilled con artist Rick Singer ("Singer"), and is waiting for his day in court to prove his innocence.

17.     Mr. Wilson is a hardworking, generous person with no prior criminal record who is extremely supportive of his family and his children. Mr. Wilson and the Wilson family have a long record of community service, including Mr. Wilson's fifteen-plus years of service as a board member of Cure Autism Now and Autism Speaks. During his lifetime, Mr. Wilson has donated millions of dollars to charitable organizations.

18.     Mr. Wilson did not seek out Singer. Instead, he was referred to Singer by a world-renowned financial advisory firm. This firm told Mr. Wilson that Singer was a highly reputable college admissions counselor used by many of their other clients and implied that his services were fully legitimate. Mr. Wilson was never given any reason to believe that Singer's services, including his now infamous "side-door" program which he openly marketed to Mr. Wilson and countless other parents (including in a presentation at Starbucks' corporate offices), was anything but legitimate.

19.     Lacking the type of evidence of fraud or other willful wrongdoing that the government has against many of the other parents, the government's case against Mr. Wilson is

made up of out-of-context email fragments and a series of deliberately ambiguous sound bites, scripted by government agents over several months of set up calls with Singer.

20. In contrast to many of the other defendants in the 'Varsity Blues' prosecution, many of whom have pleaded guilty, neither Mr. Wilson nor his children (or Mrs. Wilson for that matter) are accused of participating in any kind of standardized test cheating.  All of the Wilson children worked hard, studied hard and took their own college admissions tests with each scoring in the top 90+ percentile, and the government has never alleged otherwise.  Likewise, Mr. Wilson is not accused of "photoshopping" or staging photos for fake athletic profiles or making a payment to line the pockets of any athletic coach or other university employee in order to gain admission to a prestigious college or university.

21. Rather, Mr. Wilson is accused of making payments which Singer and others assured him were legitimate donations, in order to assist with (but not guarantee) the admission of his very qualified children to their preferred universities.  Employing a completely novel legal theory which stretches the definition of "bribery" beyond all recognition, the government has chosen to label these payments as "bribes."

22. Mr. Wilson is falsely accused of conspiring with Singer to "bribe" his son's way into the University of Southern California ("USC") as a water polo player in 2014.  However, it is undisputed that Johnny Wilson was a star athlete, an invited member of the United States Olympic water polo development program, and that his grades and test scores were more than sufficient to gain admission to USC.  He was a starter on multiple highly nationally ranked high school and club teams and was approached by more than one Division I college water polo and swimming teams to possibly join their programs.  Johnny's high school coach – himself an NCAA MVP and Olympic team alternate – was openly involved with the Wilson family and was

in contact with the USC coaches about Johnny's participation in USC water polo. Unlike most of the children of the other defendant parents in the investigation, Johnny was actually an athlete and ultimately became a member of the USC water polo team. Below is a photo published in the San Jose Mercury News of Johnny Wilson competing in the West Bay Area League swimming championships in 2013, in which he won first place in the butterfly:



23. With respect to his two daughters, Mr. Wilson is accused of conspiring with Singer to gain their admission to Harvard and Stanford through the use of Singer's "side door" program in 2018. But here again, it is undisputed that Singer continued to assure Wilson in 2018, four years after Johnny's admission to USC, that the "side door" program was fully legitimate and was widely accepted by multiple universities, with Singer having done over 700 side doors in the previous year at schools across the country. Singer even told Mr. Wilson that he was personally arranging with the president of Harvard to do more side doors there. It is further undisputed that Singer told Wilson that the side door was available to non-athletes who

were academically qualified and available to serve as a team assistant manager or in other team or academic department support roles. Wilson's daughters were in fact academically qualified for admission to Harvard and Stanford, having legitimately achieved scores in the 99th percentile on their college entrance exams. One daughter achieved a perfect score on the ACT.

24. Mr. Wilson's donations in 2018 to Singer's IRS-approved foundation were made when his daughters were just 16 years old and their college applications were not even due until the year 2020. As part of his cooperation with the government, Singer told Mr. Wilson that donations made years in advance could have more impact on tight university budgets. He also told Mr. Wilson that he could even change which schools he ultimately donated to through Singer's foundation up until mid-2019.

25. Nonetheless, the Wilsons have been unfairly branded as cheaters and criminals in the media, without regard to the true facts related to their family, and how diametrically opposed they are from, for example, other parents who had their children pose for staged athletic photos or who paid a Singer representative to take their children's college entrance exams for them.

26. Defendants have now materially focused to a world-wide audience the unfair branding of the Wilson family with their new 'documentary' first streamed on Netflix on March 17, 2021. This production lumps the Wilson family in with other defendant parents, all of whom have already admitted to wrongdoing, and has the effect of making the Wilsons appear guilty simply by their association with Singer and, by extension, the other defendant parents that are now admitted felons. In fact, Mr. Wilson is the only parent featured in the documentary who has pleaded not guilty and is intending to go to trial to prove his innocence.

27. Worse, Defendants ignored publicly available facts and documents that were readily accessible to them from court filings that make clear that Mr. Wilson is innocent and has

been falsely accused and any suggestion that his children benefitted from any alleged wrongdoing and were not capable of gaining admission to college on their own is not true.

28.     Even a cursory viewing of the actual production makes clear that Defendants made no attempt to separate Mr. Wilson and his family out from the dozens of other defendant parents who pled guilty and were sentenced as part of the "Varsity Blues" prosecutions.  Other than momentarily acknowledging at the end of this approximately 100-minute piece that Mr. Wilson has pled not guilty, Defendants made no attempt to educate its worldwide viewers that, for example, Johnny was not a "fake athlete" or the academic gifts of each of the Wilson children.

29.     Instead, the 'documentary' contains reenactments of telephone calls between Singer and Mr. Wilson just as it does for calls Singer's calls with other defendant parents that have pleaded guilty.  Excerpts of calls with Mr. Wilson are taken out of context and spliced into sequences with excerpts of calls featuring other parents making genuinely incriminating statements.  As a result, any reasonable viewer of the 'documentary' is rendered unable to distinguish between the various parent defendants and is left with the untrue perception of the Wilsons being just like the defendant parents who orchestrated through Singer standardized test cheating, staging or "photoshopping" photos of non-athlete children for fake athletic profiles, and paying bribes to college or university personnel in order to gain admission for their children. Indeed, in a highly and deliberately misleading fashion, the opening credits of the documentary feature audio of a call between Mr. Wilson and Singer while highly inflammatory images pertaining to other defendant parents – including a sequence clearly depicting the "photoshopping" of a photo of a water polo player – are displayed on the screen.

30. Worse, prior to the publication of the 'documentary' last month, the Wilson family warned Defendants about lumping Mr. Wilson in with the other defendant parents in a letter dated March 5, 2021, which included publicly available supporting documentation for a number of exculpatory facts related to Mr. Wilson's case (the "Wilson Letter").  A copy of the Wilson Letter with its enclosures is attached hereto as **Exhibit 1**.

31. First, the Wilson Letter put Defendants on notice of the following facts and provided documentary support for them:

   a. Mr. Wilson's son was a highly competitive high school and club water polo player *and was a member of the USC water polo team*.

   b. Singer wrote in his own notes that Mr. Wilson's payment to USC was a "*donation to USC program for real polo player*" and told the FBI that he had no recollection of Wilson knowing of any "inaccuracies in his son's athletic profile."

   c. Of the funds that Mr. Wilson intended to donate to USC in connection with his son's admission, Singer stole $100,000 and $100,000 went to USC itself (not a coach or any other USC employee), with USC acknowledging the gift *in an official USC thank you letter*.  Indeed, Singer consistently told Mr. Wilson that all monies paid in connection with his "side door" program went to the schools.

*See* Ex. 1 at p. 3 (citing and including exhibits to the Wilson Letter).

32. The 'documentary' fails to even mention these material and exculpatory facts that show the Wilson family's circumstances are entirely different.  Instead, it insinuates throughout that the Wilsons are no different from any other family caught up in this scandal.

33. Second, the Wilson Letter warned Defendants that the reenactment of any recorded calls between Singer and Mr. Wilson that did not include the following unrebutted facts available in the public record would necessarily be highly misleading to the audience and defamatory of the Wilson family, and not a fair and accurate report of the proceedings against Mr. Wilson:

- 10 -

a. When Singer and Mr. Wilson discussed possible donations to Harvard and Stanford in connection with Wilson's daughters' college admissions, Singer assured Wilson of the propriety of such donations, including by telling Mr. Wilson that he was "going to Harvard next Friday, because the president wants to do a deal with me, because he found out that I've already got four already in, without his help, so he's like . . . 'why would you go to somebody else if you could come to me?'"

b. Singer promoted his "side door" as a fully legitimate option, including in a presentation to dozens of management employees at Starbucks' offices.

c. In calls which were recorded without Singer's knowledge and prior to his becoming a government cooperator, Singer described payments made as part of his "side door" program as legitimate donations to universities. Then, once he was cooperating, Singer, at the government's direction, began subtly introducing purposefully ambiguous language, including in calls with Mr. Wilson. This purposefully ambiguous language was intended to allow the government to insinuate that Mr. Wilson and other defendants understood payments were going to coaches' personal accounts rather than to those coaches' programs.

d. Singer's own notes reflect that, during a "[l]oud and abrasive call with agents" early on in his cooperation, investigators instructed him to "bend the truth" and get "each person to agree to a lie[,]" by "continu[ing] to ask me to tell a fib and not restate what I told my clients as to where there [sic] money was going -to the program not the coach and that it was a donation and they want it to be a payment."

*See* Ex. 1 at pp. 3-4 (citing and including exhibits to the Wilson Letter).

34. Further, the Wilson Letter explained that the Government's manipulation of Singer's post-cooperation recorded calls with Mr. Wilson was particularly egregious, evincing a deliberate effort to create highly misleading "sound bites" which it could later take out of context to create the false impression that Mr. Wilson agreed to make illicit payments to university officials. On a September 28, 2018 FaceTime call with the Wilson family to discuss the Wilson daughters' college application process, which took place after Singer's cooperation began, Singer made highly exculpatory statements that continued to reassure the Wilson family of the propriety of the side door program. Singer said that side door donations, like Mr. Wilson's 2014 contribution to USC's water polo program, were a legitimate and prevalent aspect of college

admissions that allowed schools to fund their programs. Singer explained that schools and teams can admit non-athlete applicants with the necessary academic credentials, if those students worked as assistant managers or in other support roles. The Government made no record of this 30+ minute FaceTime call, even though Singer made the call from an FBI office at a break during an interview conducted by half a dozen agents and "Varsity Blues" prosecutors. The Government has not disputed Mr. Wilson's evidence concerning the FaceTime call, including his own sworn affidavit, or explained its failure to record the call other than to claim their agents were not present with Singer during the call. According to a public pleading, the "Government have taken steps to remove all traces of this call from text messages, reports, and notes[.]" *See* Ex. 1 at p. 4 (citing and including exhibits to the Wilson Letter).

35. Additionally, the Wilson Letter warned that, beginning September 29, 2018, and continuing for weeks after the government's "loud and abrasive" instructions to Singer to "bend the truth," Singer began interjecting false incriminating phrases during calls that the government *did* record. An October 15, 2018 call with Mr. Wilson included this exchange:

> SINGER: So I know when . . . we get the girls in, it's a done deal and you're gonna take care of your part of it, you're gonna make the payments *to the schools* and the -- *to the coaches*. And that's what I need . . . so I'm not worried about that.
>
> WILSON: Uh, uh, help me understand the logistics? I thought I make the payment to you and you made the payment *to the school*.
>
> SINGER: Correct. That's correct.
>
> WILSON: Oh you said that *I* make the payments *to the schools*.

Singer's references to payments going "to the coaches" are misleading and paint a false picture given his earlier statements to Mr. Wilson that, as before, his payments would go to the university. That is precisely what the Government agents wanted when they told Singer to "bend the truth" and get "each person to agree to a lie." Of course, the distinction between a payment

to a coach's personal account and a payment to a coach's university program is critical where the latter is not a crime.  Indeed, the court in another of the Varsity Blues prosecutions observed that a payment which is received by the university, as opposed to a coach personally, is "not a bribe," and the Government's prosecution based on payments to universities is "a case in search of a bribe or a kickback." *See* Ex. 1 at p. 5 (citing and including exhibits to the Wilson Letter).

36. The 'documentary' includes no less than nine (9) reenactments of calls between Singer and Mr. Wilson but fails to even mention these material and exculpatory facts.

37. Finally, the Wilson Letter put Defendants on notice that, in order to establish the truth and to protect his children from false claims, Mr. Wilson had taken the extraordinary step of submitting to a two-day polygraph examination, which he passed uniformly.  Since the trial of his case has already been delayed over two and a half years, Mr. Wilson took this step to clear his family's name should anything happen to him before he can be exonerated at trial.  The polygraph examination was conducted by Kendall W. Shull, former Chief and Program Manager of the FBI's Investigation Polygraph Unit, and the results were independently reviewed by Donald J. Krapohl, a former polygraph manager and examiner at the CIA.  The results indicate that Mr. Wilson was being truthful in response to all of the many questions asked including, without limitation, whether Mr. Wilson ever knowingly bribed or directed anyone else to bribe a college official, whether he was aware of any fabrications in his son's athletic profile, and whether he knew Singer's college application process was illegal.  *See* Ex. 1 at pp. 5-7.

38. The 'documentary' contains no reference to Mr. Wilson's polygraph test.

39. There is nothing fair or accurate about how the Wilsons are portrayed in the 'documentary' now streaming on Netflix.  Defendants did not heed the Wilson family's warning and made no effort in the 'documentary' to distinguish the Wilson family circumstances from the

scores of defendant parents who pled guilty to such crimes.  Nor did Defendants exercise the option available to them to delay the release of 'documentary' in order to edit the 'documentary' to include the facts necessary to fairly and accurately report on the nature of the Wilson Family's involvement with Singer.

40.	Instead, Defendants merely provided the Wilson family with a terse and dismissive response to the Wilson Letter on the day before the 'documentary' was first streamed to a worldwide audience that continues to sit at home and watch television while they wait for a return to normal life.  A copy of Defendants' response is attached hereto as **Exhibit 2**.

41.	The publication of this 'documentary' has already had a profound effect on the Wilson family and has caused irreparable damage to their reputation in the community.

### Count I – Defamation

42.	Plaintiffs repeat and re-allege the allegations set forth above.

43.	Each member of the Wilson family is a private citizen.

44.	Through their streaming of the 'documentary' on Netflix, Defendants have published statements of and concerning the Wilson family, and each individual member thereof, that they knew to be false, recklessly disregarded their falsity, or should have known to be false in the exercise of reasonable care.  These statements are defamatory.

45.	Defendants held the Wilson up to public scorn and ridicule and destroyed their good name and reputation.  A reasonable viewer of the 'documentary' would be led to believe that the Wilsons are no different from other families caught up in the "Varsity Blues" investigation and that their children pretended to be athletes and cheated on standardized tests in order to gain admission to prestigious colleges and universities.

46. As a result of this defamation, Plaintiffs have suffered, and continue to suffer, substantial harm and damages. They are entitled to public apologies and retractions and the award of significant monetary damages.

WHEREFORE, Plaintiffs respectfully requests that this Court grant them the following relief on this Complaint and Jury Demand:

(i) find in favor of Plaintiffs and against Defendants;

(ii) order public apologies and retractions;

(iii) award Plaintiffs monetary damages; and

(iv) grant such other and further relief as this Court deems equitable and just.

## Jury Demand

Pursuant to Rule 38(b) of the Massachusetts Rules of Civil Procedure, Plaintiffs hereby demand a jury on all claims and issues so triable.

THE WILSON FAMILY,

By their attorneys,

 */s/ Howard M. Cooper*
Howard M. Cooper (BBO #543842)
hcooper@toddweld.com
Christian G. Kiely (BBO #684308)
ckiely@toddweld.com
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

April 6, 2021