UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN B. WILSON, et al., | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) CIVIL ACTION |
| | ) NO. 1:21-CV-10894-MLW |
| NETLIX, INC., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

Defendants Netflix, Inc. ("Netflix"), Netflix Worldwide Entertainment, LLC ("NWE"), 241C Library Films, LLC ("241C"), Library Films, LLC ("LF"), Jon Karmen ("Karmen"), and Chris Smith ("Smith") (collectively, "the Defendants" ) respectfully submit this memorandum of law in support of their motion to dismiss plaintiffs' complaint for failure to state a claim.

## I.     <u>INTRODUCTION</u>

This is a defamation action brought by a husband and wife and their son arising out of the Netflix documentary *Operation Varsity Blues: The College Admissions Scandal* (the "Film"). Plaintiff John B. Wilson, Jr. ("Wilson") is a defendant in *United States v. Wilson*, D. Mass. 1:19-cr-10080-NMG-17 ("*Wilson*").   Wilson is married to plaintiff Leslie Wilson ("Mrs. Wilson"). Plaintiff John B. Wilson, Jr. ("John Jr.") is their son.  Complaint, ¶¶ 4-6.  Of the three Plaintiffs, only Wilson is portrayed in the Film.

Wilson has alleged that he is the victim of an "unfair prosecution," that the government's case is "made up of out-of-context email fragments and a series of deliberately ambiguous sound bites, scripted by government agents over several months" and pursues a "completely novel legal theory which stretches the definition of 'bribery' beyond all recognition[.]"  Complaint, ¶¶ 1, 19, 21.  He

claims that "Defendants ignored publicly available facts and documents that were readily accessible to them from court filings that *make clear that Mr. Wilson is innocent and has been falsely accused*[.]" *Id.* ¶ 27 (emphasis added).  Wilson's theory of the case is that the only way the press could have fairly reported on his prosecution before trial was to accept his version of events, adopt his accusations of government misconduct, and proclaim him an innocent man wrongly charged.

Libel law recognizes no such theory of relief.  Under the fair report privilege, all that is required when reporting on a criminal case is that the press provide a "rough-and-ready" summary of the proceedings that is "substantially correct," precisely what Netflix did here.  *Yohe v. Nugent*, 321 F. 3d 35, 43 (1st Cir. 2003) (citation omitted).  As Justice Holmes recognized long ago,

> Though the publication of such proceedings may be to the disadvantage of the particular individual concerned, yet it is of vast importance to the public that the proceedings of courts of justice should be universally known. The general advantage to the country in having these proceedings made public, more than counterbalances the inconveniences to the private persons whose conduct may be the subject of such proceedings.

*Cowley v. Pulsifer*, 137 Mass. 392, 393-394 (1884) (internal quotation marks and citation omitted).

"[S]ummary disposition of defamation claims is 'especially favored' in Massachusetts because meritless cases put 'an unjustified and serious damper on freedom of expression' and 'the costs of litigation may induce an unnecessary and undesirable self-censorship.'"  *Mullane v. Breaking Media, Inc.*, 433 F. Supp. 3d 102, 110 (D. Mass. 2020) (citation omitted).  "Given these policy rationales, it is important that [the fair report] privilege be construed liberally and with an eye toward disposing of cases at an early stage of litigation."  *Howell v. Enterprise Publishing Co.*, 455 Mass. 641, 653, 920 N.E.2d 1, 15 (2010); *see also id*. at 661, 920 N.E.2d at 21 ("usually it will be appropriate for the judge to decide whether the privilege attaches in a particular case.").  As shown below, because the Film is a fair report of the charges brought against Wilson, the defamation claims of all of three Plaintiffs fail as a matter of law.  Mrs. Wilson and John

Jr.'s claims independently fail because the Film contains no defamatory statements of and concerning them.

## II.      STATEMENT OF FACTS[1]

### A.      United States v. Wilson

On March 29, 2019, the United States Attorney's Office for the District of Massachusetts issued a press release announcing that "[d]ozens of individuals involved in a nationwide conspiracy that facilitated cheating on college entrance exams and the admission of students to elite universities as purported athletic recruits were arrested by federal agents . . . and charged in federal court in Boston."[2]  The mastermind behind this criminal scheme, the government alleged, was William "Rick" Singer, who owned and operated the Edge College & Career Network LLC ("The Key") – a for-profit college counseling and preparation business – and Key Worldwide Foundation ("KWF") – a non-profit corporation established as a purported charity.  Using these companies, Singer allegedly conspired with dozens of parents, athletic coaches, a university athletics administrator, and others, to use bribery and other forms of fraud to secure the admission of students to colleges and universities. *Id.*[3]

---

[1] In ruling on a motion to dismiss, the Court "can consider 'implications from documents attached to or fairly 'incorporated into the complaint, and 'facts' susceptible to 'judicial notice[.]'" *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).

[2]   *See*   https://www.justice.gov/usao-ma/pr/arrests-made-nationwide-college-admissions-scam-alleged-exam-cheating-athletic (Defendants' Motion to Dismiss ("MTD") at **Ex. A**).   The announcement described three sets of charges: (a) a college entrance exam cheating scheme; (b) a college recruitment scheme that allegedly involved bribes paid to university employees to designate students as purported athletic recruits, facilitating their admission through a "side door"; and (c) a tax fraud conspiracy.  *Id.*

[3] "In September 2018, six months after the investigation began, government agents approached Singer in the midst of a meeting in which he was suspected of being involved in criminal conduct and he agreed to cooperate. As part of his cooperation, Singer consented to a wiretap of his phone and agreed to make recorded calls to potential suspects to discuss the alleged bribery scheme."

The government's press release identified Wilson as among those arrested and charged.  *Id. See also Wilson*, Dkt. 3-1 (excerpt) (MTD at **Ex. C**); Dkt. 3-4 at ¶¶ 287-310 (excerpts of FBI Affidavit detailing initial charges against Wilson) (MTD at **Ex. D**).  By his own account, Wilson "is the only defendant charged in a total of nine counts," and "is the only one facing substantive federal-program bribery charges, and the only one facing a tax charge."  *Id.* Dkt. 995 at 13 (MTD at **Ex. E**).  Along with seven other defendants who have pleaded not guilty, he currently is awaiting trial.

### B.    The Wilson Criminal Complaint and Superseding Indictments

Wilson is charged with conspiring to bribe USC's water polo coach, Jovan Vavic ("Vavic") to designate Wilson's son as a "purported recruit" to the USC men's water polo team, facilitating his admission to USC.  *Wilson*, Dkt. 3-4, ¶ 288 (MTD at **Ex. D**).  (Vavic is separately charged with accepting a bribe to admit Wilson's son as a purported recruit to the water polo team.)[4]  Wilson also is charged with seeking to use bribes to obtain the admission of his twin daughters to Stanford and Harvard as recruited athletes.  *Id.*

#### 1.    Charges Relating to John Jr.'s Admission to USC

In February 2013, Wilson e-mailed Singer and asked for the "deadline to decide on side door for USC or BC or Georgetown etc. this year" and to "confirm for which schools is side door option really viable."[5]  Singer responded that the deadline for USC and Boston College was "mid July," and

---

*Wilson*, Memorandum and Order on Motion to Dismiss (May 8, 2020), Dkt. 1169 at 1-2 (MTD at **Ex. B**).

[4] *See Wilson*, Dkt. 732 (Wilson Fourth Superseding Indictment), ¶¶ 229, 231-33 (MTD at **Ex. F**); *United States v. Vavic*, D. Mass. 1:19cr-10081-IT, Dkt. 505 (Vavic Second Superseding Indictment), ¶¶ 30-33 (MTD at **Ex. G**).

[5] *See also Wilson*, Dkt. 732 at 35, ¶ (MTD at **Ex. F**) ("Beginning in or about 2013, WILSON agreed to pay Singer an amount, ultimately totaling $220,000, to facilitate his son's admission to

that "Jovan [Vavic] is giving me 1 boys slot and as of yet no one has stepped up to commit[.]" *Wilson*, Dkt. 3-4, ¶ 290 (first brackets in original) (MTD at **Ex. D**).

In March 2013, Wilson e-mailed Singer asking: "Would the other kids know [my son] was a bench warmer side door person?"  He emailed Singer again the next day saying: "So it sounds like even if [my son] practices all the time etc it will be known that he is a bench warming candidate? Obviously his skill level may be below the other freshmen. In your view will he be so weak as to be a clear misfit at practice etc?"  *Id.* ¶ 292 (brackets in original).

Singer told Wilson that John Jr. would not actually be expected to play water polo for USC. In response to an e-mail from Wilson about his son's commitment to the team "if he did the side door at USC," Singer replied: "Travel is only if he is playing so No-the commitment is to be on the roster not attend all practices but he will have to attend drug tests and other mandatory functions for 1 year then walk away/frankly after the 1st semester he can move on." *Id.* ¶ 293.  (John Jr. withdrew from the USC water polo team after his first semester at USC "due to a purported injury." *Id.* ¶ 303; *id.* Dkt. 1438 at 3 (MTD at Ex. **H**)).

In October 2013, Vavic advised Singer that he needed an athletic profile for John Jr. and that it "needs to be a good resume."  Singer subsequently provided Vavic with a falsified profile that included fake swimming times and awards. *Id.* ¶ 295.  The government later specified that in October 2013, in response to an email from Wilson asking for an update on John Jr.'s college application process, "Singer replied that Vavic had [John Jr.'s] information and 'asked me to embellish his profile more, which I am doing.'"  *Wilson*, Dkt. 732 at 35-36 ¶¶ 229, 233 (MTD at **Ex. F**); *see also id.* Dkt.

---

USC as a purported water polo recruit. Beginning in or about 2018, WILSON agreed to pay Singer an amount, ultimately totaling $1.5 million, to facilitate his twin daughters' admissions to Stanford and Harvard as purported athletic recruits.").

1510-1 at 9 ("embellish" email) (MTD at **Ex. I**).  Singer sent the embellished profile to both Wilson

and Vavic.  *Id.* Dkt. 1510-1 at 12-13 (**MTD at Ex. I**); Dkt. 732 at 36, ¶¶ 231-32 (MTD at **Ex. F**).[6]

      In an e-mail exchange on or about January 21, 2014, Vavic asked Singer to confirm that

Wilson's son was still interested in attending USC.  Singer confirmed that John Jr. was still interested

and that the "family is ready to help."  Vavic replied that he would present John Jr. to the USC

subcommittee for athletic admissions with his "top walkons."  *Wilson*, Dkt. 3-4 ¶ 296 (MTD at **Ex.
D**).  On about February 26, 2014, Vavic e-mailed a USC athletics administrator that Wilson's son

"would be the fastest player on our team, he swims 50 y in 20 [seconds], my fastest players are around

22 [seconds], this kid can fly."  *Id.* ¶ 297 (brackets in original).  This purported performance figure,

"derived from the falsified athletic profile [Singer] provided Vavic, was fabricated."  *Id.* ¶ 297; *see

also id.* Dkt. 732, ¶¶ 228-29, 231-33 (MTD at **Ex. F**); *Vavic*, *supra*, Dkt. 505, ¶¶ 30-32 (MTD at **Ex.
G**).

      John Jr. was granted admission to USC as a water polo recruit on or about February 28, 2014.

*Wilson*, Dkt. 3-4, ¶ 298 (MTD at **Ex. D**).  On about March 1, 2014, Wilson e-mailed Singer under the

subject line "USC fees," and wrote:

> Thanks again for making this happen! Pls give me the invoice. What are the options
> for the payment? Can we make it for consulting or whatever from the [K]ey so that I
> can pay it from the corporate account?

---

[6] John Jr.'s high school water polo coach confirmed that the profile contained misrepresentations
of John Jr.'s athletic accomplishments (*e.g.*, he was not the co-captain in any year; he was not the
CCS 2012 Offensive Most Valuable Player (MVP); did not receive the 2012 MENLO SCHOOL:
Offensive MVP award).  Dkt. 1510-1 at 16-18 (MTD at **Ex. I**).

Singer replied that he could make the invoice for business consulting fees, so that Wilson could "write off as an expense."  Wilson replied, "Awesome!"  *Id.* ¶ 299.[7]

### 2.    Charges Relating to Wilson's Daughters

In September 2018, over four years after John Jr.'s admission to USC, Wilson asked Singer about potential "side door" opportunities for his daughters.  Singer explained, in substance, that he could get Wilson's daughters into college through the athletic recruitment scheme even if they did not play the sport for which they were purportedly recruited. The government recorded Wilson's telephone call with Singer, an excerpt of which is below (*Wilson*, Dkt. 3-4. ¶ 304):

| | |
|---|---|
| WILSON | And what were the schools in that, if you did the side door? And I'm interested about the side door and that stuff-- |
| SINGER | So the side door is gonna be-- gonna happen where you want 'em to happen. [inaudible] |
| WILSON | It can happen anywhere? Does it have to be a sports side door? I wasn't clear on that. |
| SINGER | Well, so that's the—that's the easiest way to approach it, right-- |
| WILSON | Yeah |
| SINGER | --because all of the coaches have -- you know, they have guaranteed spots, and you've done a good job, you got athletic girls who got great size, they're in the right sports, so, you know, potentially there's a sailing option, and potentially there's a crew option. I mean, I don't know how good of athletes they are. They may be good enough to be able to compete at some of these schools, and then who knows what we have to do, depending on where, where the spots [inaudible]. |
| WILSON | Mm-hmm. Yeah, so they-- |
| SINGER | So you have-- |

---

[7] On or about April 7, 2014, Wilson's company wired $100,000 to KWF, $100,000 to the The Key, and $20,000 to Singer directly.  Dkt 3-4 at ¶ 300 (MTD at **Ex. D**).  Wilson subsequently was charged with tax fraud.  Dkt. 732 at 56-59 (MTD at **Ex. F**).

WILSON     --have to get that sports. What if they're not really that good? I mean, they can do some crew, but I don't know they're gonna be good. [One daughter's] not even that good competitively at sailing. She just taught sailing and did sailing in, you know [inaudible]

SINGER     Right, so--

WILSON     --yacht club.

SINGER     But at the end of the day, by the side door, I may be able to go to the sailing coach and say, "Hey, this family's willing to make the contributions. She could be on your team. She is a sailor. She may not be up to the level you are, but she can con-- you know, you're gonna get a benefit, and the family's gonna get benefit. So are you will-- are you interested in doing that?" *Id.*

During a call in October 2018, Singer listed various "side door" options for Wilson's daughters and noted that for any of those options, Wilson's daughters "don't have to play. They just—that's the path I'm gonna get 'em in on." Wilson responded, "Gotcha." Wilson then asked Singer what would happen if his daughters "don't actually get in?" Singer replied, "Oh, no, no, no. Y-you don't have to worry about it. They're—it's g—it's a done deal." Wilson subsequently advised Singer that he wanted to pursue "side doors" for his daughters at Stanford and Harvard. *Id.* ¶ 305.

During the same call, Singer explained that if Wilson were to deposit $500,000 into KWF immediately, he would give Wilson first priority on any admission spots he secured, because Singer had to give spots to "whoever's gonna ante up." *Id.* ¶ 306. Wilson responded, "Yeah," and asked Singer for his wire information. *Id.* ¶ 307.[8]

---

[8] On about October 17, 2018, Wilson's company wired $500,000 to an account in the name of KWF in the District of Massachusetts. At the time, Wilson did not know that the account had been opened by Singer at the direction of federal agents. *Wilson*, Dkt. 3-4 at ¶ 307 (MTD at **Ex. D**).

On about October 27, 2018, Singer told Wilson that he had secured a "side door" deal for one of Wilson's daughters with the Stanford sailing coach, John Vandemoer, and that the deal with Vandemoer was hidden from Stanford. *Id.* ¶ 308.[9]  The following is an excerpt from the call:

SINGER      So I had a conversation with the Stanford sailing coach and, so I just gave the Stanford sailing coach [$]160,000 for his program and while we were having that conversation I said, "Hey, I'm hoping that this 160 that I'm helping you with helps secure a spot for next year. Can I be guaranteed a spot for next year?" And he said, "Yes."

WILSON      [inaudible] all it takes?

SINGER      So-- no, no, no, no. That's not all it takes.

WILSON      Okay. (Laughter)

SINGER      This is not TJ Maxx or Marshall's or something like that. So--

WILSON      Right.

SINGER      So essentially if you're-- I want you to have first dibs, like I told you. So if you want I can provide John Vandemoer-- which I'm going to essentially send John directly the check, to the coach. I can send him your [$]500,000 that you wired into my account to secure the spot for one of your girls. I asked him for a second spot in sailing and he said he can't do that because he has to actually recruit some real sailors so that Stanford doesn't--

WILSON      (Laughter)

SINGER      --catch on.

WILSON      Right.

SINGER      Okay. So--

WILSON      Yeah, no. He's got to--

SINGER      --Stanford--

WILSON      -- actually have some sailors. Yeah.

---

[9] Vandemoer agreed to plead guilty to a charge of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d).  *Id.* ¶ 308 n.21.

SINGER        Yeah. So that Stanford doesn't catch on to what he's doing.

WILSON       Right.

SINGER        So-- and I-- that doesn't mean I'm not going to pursue other Stanford coaches, and to be frank with you, it doesn't matter if it's one of the girls who's not a sailor. I can still put her as a sailor. Or, obviously, the one that is, I can—I'll mark that she's a sailor because she is, but not at the level in which she can sail at Stanford.

WILSON       Right, right. *Id.* ¶ 308.

In November 2018, Singer told Wilson that he had secured an admissions spot at Harvard through a fictitious "senior women's administrator," and that, in exchange for a $500,000 payment to her, the administrator would designate one of Wilson's daughters as an athletic recruit. *Id.* ¶ 309. The following is an excerpt from the recorded call:

SINGER        So I got the senior women's administrator at Harvard is going to give us a spot. What we have to do is we'll have to give her $500,000. That money, obviously, like the others, will go through my foundation and then I will fund the senior women's administrator at Harvard. And then in the spring, since I've already paid John Vandemoer the 500 and now we'll give the senior women's administrator 500, so I got another deal for you. Is-- your total's going to be 1.5.  250 will come in the spring for Stanford and 250 for Harvard in the spring and we'll ha-- and we'll be solid. We'll be done. We'll apply like a normal student but we'll know that we're getting in in the late fall of next year.

WILSON       Okay, great. So what is that going to be? This is the senior women's-- what does she have, no team or anything like that or—

SINGER        She'll figure it out. So it won't mean-- it doesn't matter the sport at this point. She will figure it out and get it done. So--and the same thing for--maybe she won't have to sail but we're going to put her through sailing and John Vandemoer. This is actually a better play at Harvard because she will just get her in through athletics in one of the sports but it won't matter. It won't matter at all. *Id.* ¶ 309.[10]

---

[10] During the same call, Singer told Wilson he would need another $500,000 payment to secure the spot at Harvard. Thereafter, on or about December 11, 2018, Wilson's company wired another $500,000 to the Massachusetts account in the name of KWF. *Id.* ¶ 310.

C.    **The Film**

The Film was directed by Defendant Smith and produced by Defendant Karmen, accomplished documentarians.[11]  The opening scenes are of students learning whether they have been admitted to college.[12]  MTD at **Ex. K** at 0:07-0:42.  There follows a montage of network news reports on the "Varsity Blues" prosecutions, identifying Rick Singer as the "mastermind behind the entire operation [] sending shockwaves across the country."  *Id.* at 0:52-1:37.  Approximately four minutes into the Film, text appears stating "The conversations in this film are real.  They are recreations of wiretap transcripts released by the US government.  Some conversations have been combined or modified for time and clarity."  *Id.* at 3:48-4:07.  Much of the film consists of re-enactments of recorded telephone conversations, video of some defendants and their families, and commentary by education consultants, some of Singer's former clients, and news reporters.

As the Film nears its conclusion, the status of the cases depicted in the Film is reported, including pleas of guilty and not guilty.  *Id.* at 1:31:59-1:33:23.  Four defendants were identified as having pleaded not guilty: Wilson; Donna Heinel, the former senior associate athletic director at USC; Jovan Vavic, the former head coach of USC's men's and women's water polo teams; and Gordie Ernst, the former Georgetown tennis coach.  *Id.*  The guilty pleas of 12 other defendants also were reported.  *Id.*

Wilson does not dispute that he spoke the words attributed to him in the Film.  He instead claims that the transcripts filed by the government are themselves misleading and that Defendants

---

[11]    *See,  e.g.*,  IMBd  Awards  Page  (https://www.imdb.com/name/nm0807687/awards; https://www.imdb.com/name/nm3885651/awards) (MTD at **Ex. J**).

[12] Defendants have filed with the Court a CD containing the Film (MTD at **Ex. K**).  Wilson scenes can be found at the following time-stamps: 2:03-3:22; 3:39-4:49; 5:26-5:32; 20:52-21:53; 23:20-24:06;  35:13;  36:16-36:23;  1:31:13-1:31:15;  1:32:47-1:32:52.  OPERATION VARSITY BLUES (Netflix 2021).  See Schatz, 699 F.3d at 55; *see also Damon v. Moore*, 520 F. 3d 98, 105-106 (1st Cir. 2008) (affirming motion to dismiss libel claim based on review of film at issue).

took statements out of context and refused to include evidence showing that Wilson is innocent. Complaint, ¶¶ 27, 29.

## III.    ARGUMENT

### A.    The Film Is a Privileged Fair Report of the Wilson Prosecution.

"Massachusetts has long recognized a privilege for fair and accurate reports of official actions and statements." *Howell*, 455 Mass. at 650, 920 N.E.2d at 13.   The privilege applies to news reports of official government action and records, including court records and proceedings, without regard to the truth of the underlying charges. *See Yohe*, 321 F.3d at 44.[13]

In order to be privileged, the report "need be neither exhaustive in detail nor perfectly precise in language." *Ricci v. Venture Magazine,* 574 F. Supp. 1563, 1567 (D. Mass. 1983). All that is required is a "rough-and-ready summary" of the judicial action or record. *Yohe*, 321 F. 3d at 43; *MiGi, Inc. v. Gannett Mass. Broadcasters*, 25 Mass. App. Ct. 394, 396, 519 N.E.2d 283, 285 (1988). "A statement is considered a fair report 'if its "gist" or "sting" is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced.'" *Howell*, 455 Mass. at 662, 920 N.E.2d at 22 (citation omitted).[14]

In *Ricci*, for example, the plaintiff sued over an article reporting that criminal charges against him were dismissed "after an emotional outburst in which he threatened a witness in the courtroom." 574 F. Supp. at 1566. The article failed to report that the allegation was

---

[13] *See also Brown v. Hearst Corp.*, 54 F. 3d 21, 25 (1st Cir. 1995); *Sibley v. Holyoke Transcript-Telegram Pub. Co.*, 391 Mass. 468, 471, 461 N.E.2d 823, 826 (1984); *Reilly v. Associated Press,* 59 Mass. App. Ct. 764, 767–77, 797 N.E.2d 1204, 1214-15 (2003).

[14] The privilege applies to reports on pending cases. *See Kimball v. Post Pub. Co.*, 199 Mass. 248, 250, 85 N.E. 103, 103 (1908) ("it was a subject for a privileged report, although the cause had not yet been finished"). *See also id.* ("If this were not so then, in the language of Lord Esher, 'the ridiculous result would follow that, [w]here the trial of a case of the greatest possible interest lasted 50 days, no report could be published until it was ended.'") (citation omitted).

denied by plaintiff's criminal defense lawyer and that the trial court never resolved the issue. *Id.* at 1566, 1568.  Despite those omissions, the court held that the article was a privileged fair report.  Applying a "common sense standard of expected lay interpretation of the report," the court reasoned that "[a] full report of all the details of this incident, including the two eyewitness reports, the claims that the gesture was a threat, and the judge's decision to sever, as well as Ricci's attorney's version, would be no less susceptible of being read as conveying a sting derogatory to plaintiff than was the abridged report actually made."  *Id.* at 1568.

The district court applied similar reasoning in *Brown v. Hearst Corp.*, 862 F. Supp. 622 (D. Mass. 1994), *aff'd*, 54 F. 3d 21.  The plaintiff in *Brown* was a pilot who lived in the same town in which another pilot had murdered his wife and disposed of her body in a woodchipper. 862 F. Supp. at 625.  The plaintiff's wife subsequently disappeared.  *Id.* at 626.  Defendants aired a broadcast about both cases entitled "The Other Pilot's Wife."  *Id.* at 625.  The plaintiff, who was never charged with his wife's murder, claimed that combining the two cases in one broadcast defamed him by implying that he murdered his wife.  *Id.* at 626.  The district court held that "the mere juxtaposition in the same Broadcast did not, for that reason alone, defame the plaintiff" and that the portions of the broadcast based on divorce proceedings that occurred after the plaintiff's wife disappeared were privileged fair reports.  *Id.* at 628, 629-31.  *See also id.* at 630 ("the fair report privilege applies even if the report might induce readers to reach derogatory conclusions that were never proven to be true"); *see also Jones v. Taibbi*, 400 Mass. 786, 795-96, 512 N.E.2d 260, 266 (1987) (privilege not lost when a broadcast reported plaintiff had been charged with murder rather than only arrested on suspicion of murder).

On this motion to dismiss, the court can refer to the cited and attached public records, including from the government's case against Wilson, to determine that Wilson's complaints

about the fairness and accuracy of the Film are baseless as a matter of law.  As such, the Complaint fails to state a claim upon which relief may be granted and should be dismissed with prejudice.

### 1.    Wilson's Polygraph Examination

Wilson complains that the Film did not mention his successful polygraph examination. Complaint, ¶¶ 3, 37-38.  But the fair report privilege does not require the press to include extrinsic information—exculpatory or inculpatory—that is not part of the court proceeding (particularly not polygraph examinations known to be of "dubious scientific value[.]").  *United States v. Rodriguez-Berrios*, 573 F.3d 55, 73 (1st Cir. 2009) (internal quotation marks and citation omitted).  In *Sibley*, for example, the plaintiff sued over the publication of an article containing false charges made against him in a search warrant affidavit.  Despite that the defendant conducted no investigation of the allegations and a grand jury later returned a no bill on the charges, the Supreme Judicial Court held that the article was a privileged fair report:

> Doubtlessly, it is painful to be cast before the public as the target of an investigation where later events point to baseless or vexatious charges. The greater wrong, however, would be to shroud in secrecy, for want of publication, the government's scrutiny of its citizens.

391 Mass. at 470, 472, 461 N.E.2d at 825.  *See also Riley v. Harr*, 292 F.3d 282, 296-97 (1st Cir. 2002) (privilege applied even though author had sufficient time to investigate the truth of court charges).  That the Film did not refer to Wilson's lie detector test similarly is not actionable.

### 2.    John Jr.'s Athletic Ability

Wilson complains that the Film failed to highlight that his son "was a real and talented water polo player," and that Wilson "is not accused of 'photoshopping' or staging photos for fake athletic profiles."  *See, e.g.*, Complaint, ¶¶ 2, 21-22, 28.  Had the Defendants addressed

these issues in more detail, the Film would have been "no less susceptible of being read as conveying a sting derogatory to plaintiff." *Ricci*, 574 F. Supp. at 1568.  Court records show that (i) USC water polo coach, Jovan Vavic, was charged with accepting a bribe to have John Jr. accepted as an athletic recruit, *Vavic*, *supra*, Dkt. 505 (Vavic Second Superseding Indictment), ¶¶ 27-33 (MTD at **Ex. G**); (ii) Singer told Wilson that Vavic asked him to embellish John Jr.'s athletic profile and that Singer had done so, *Wilson*, Dkt. 732 at 35-36 ¶¶ 229, 233 (MTD at **Ex. F**); *see also id.* Dkt. 1510-1 at 9 (MTD at **Ex. I**); (iii) Singer sent the embellished profile to Wilson and to Vavic, *id.* Dkt. 1510-1 at 12-13 (MTD at **Ex. I**); Dkt. 732 at 36, ¶¶ 231-32 (MTD at **Ex. F**); (iv) John Jr.'s high school coach confirmed that the profile contained misrepresentations, *id.*, Dkt. 1510-1 at 16-18 (MTD at **Ex. I**); and (v) Wilson was recorded expressing concern that his son's "skill level" would, "[o]bviously," be "below" that of the "other freshman," and questioned whether his son may be "so weak as to be a clear misfit at practice." *Vavic*, *supra*, Dkt. 505, ¶ 32 (MTD at **Ex. G**).  *See also Wilson*, Memorandum and Order (November 25, 2020), Dkt. 1649 at 2 (MTD at **Ex. L**) ("Wilson's son played high school water polo but was not qualified to play on the varsity water polo team at [USC].").  Adding more information about John Jr.'s athletic history would not have altered the "gist" or "sting" of the Film.

### 3.      Wilson's Daughters' Academic Records

Wilson complains that the Film did not highlight his daughters' academic achievements. Complaint, ¶¶ 2, 23.  But Wilson was not charged with obtaining fake test scores for his daughters. Rather, he was charged with seeking to use bribes to obtain their admission to Stanford and Harvard as recruited athletes.  *Wilson*, Dkt. 3-4, ¶ 288 (MTD at **Ex. D**).  Wilson does not deny making the statements attributed to him on that subject.  *See id.* at ¶ 304 ("What if they're not really that good?  I mean, they can do some crew, but I don't know they're gonna be good. [One

daughter's] not even that good competitively at sailing. She just taught sailing and did sailing in, you know [inaudible]."); *id.* at ¶ 308 (Wilson agreeing with Singer that there is only one side door on the sailing team because the coach needs to "actually have some sailors.  Yeah."); *id.* Dkt. 736-1, Ex. EEE (MTD at **Ex. M**) (transcript of Singer telling Wilson that he will "split the money potentially to the coach or other pl-- parties that are out that school that need the money" and "it may go right to the coach, um, that's helping us").

### 4.    Depicting Wilson with Other Defendants

Wilson complains that the Film "lumps the Wilson family in with other defendant parents, all of whom have already admitted their wrongdoing, and has the effect of making the Wilsons appear guilty simply with their association with Singer and, by extension, the other defendant parents[.]"  Complaint, ¶ 27.  "[T]his is a complaint to be lodged against [Wilson's] accusers, not the press."  *Howell*, 455 Mass. at 670, 920 N.E.2d at 26-27.  It was the government, not the press, that publicly charged Wilson with criminal conduct and associated him with Singer and the other defendants (including many who pleaded guilty).  If Wilson's position was as unique among all defendants as he claims, his motion to sever his trial from that of his co-defendants on the grounds that his son "was a genuinely talented water polo player who did, in fact, qualify for the USC water polo team" would not have been denied by the district court, as it was.  *Wilson*, Dkt. 1438 at 6 (MTD at **Ex. H**); Dkt. 1649 (MTD at **Ex. L**).

Wilson protests that the Film failed to show how "diametrically opposed" his case is to those involving other parents "who paid a Singer representative to take their children's college entrance exams for them."  Complaint, ¶ 25.  This is a red herring.  There are two categories of parent defendants in these cases: those charged in the testing scheme; and those (like Wilson) charged in the recruitment/side door scheme.  *See Wilson*, Dkt. 883 (MTD at **Ex. N**);

*see also id.*, Dkt. 1033 (Motion to Sever) at 1 (MTD at **Ex. O**).  Wilson's contention that the charges against the side door defendants are diametrically different from the charges against the testing defendants offers no support for a libel claim.  As Judge Talwani explained when sentencing a side door defendant:

> [A]s I consider the culpability of those two different schemes, I do view – they're both fraud, they're both illegal, they both violate the same statute, but there is something that's an order of magnitude different about actually buying a specific spot at a university versus fraudulently changing part of an application.

*United States v. Semprevivo*, D. Mass. No. 19cr10117-IT-10, Dkt. 499 at 49 (MTD at **Ex. P**).

Wilson complains that because he was the only parent depicted in the Film who had not pleaded guilty, the Film falsely implies that he too is guilty.  Complaint, ¶ 27.  This claim fails because the Film correctly states that Wilson pleaded not guilty.  As in *Ricci*, so too here, "[a]lthough the public may not fully understand the presumption of innocence in criminal proceedings, no doubt they understand that there is a difference between a charge and a conviction."  574 F. Supp. at 1568.  Wilson's complaint that his not guilty plea was not reported until near the end of the Film fares no better.  The Film does not state or imply that *any* of the defendants had yet been tried and the pleas entered by *all* defendants depicted in the Film— not guilty and guilty—were displayed at the same time.  MTD **Ex. K** at 1:31:59-1:33:23.  Nor was Wilson the only defendant identified as having pleaded not guilty; the Film reported that three other defendants did as well (Jovan Vavic, Donna Heinel, and Gordie Ernst, a former Georgetown tennis coach).  *Id.*  In short, because the government charged Wilson along with dozens of other defendants, reporting on his case along with others is not actionable.  *See Brown*, 862 F. Supp. at 628, 629-31 (broadcast based on court records that juxtaposed a murder case with a missing person case in which plaintiff never was charged was a privileged fair report).

### 5. Singer's Credibility

Wilson complains that the Film does not reference notes made by Singer accusing the government of telling him to "fib." Complaint, ¶ 31(b). Whatever Singer's motivations, however, they do not alter Wilson's recorded statements. And any report of Singer's notes also would have recounted the findings made by Judge Gorton in denying the defendants' motion to strike the indictments, including that (i) when Singer made the notes, he was "surreptitiously obstructing the government's investigation by alerting potential targets"; (ii) the government "became aware of Singer's obstruction" and charged him with a single count of obstruction of justice, to which he pleaded guilty; and (iii) the notes were "1) made before Singer was fully cooperative with the government; 2) relative (primarily) to a sting operation involving parents not yet committed to Singer's 'program'; and 3) insofar as it did relate to future calls to be made to defendants, was in response to the agents' efforts to get Singer to corroborate, not fabricate, evidence." *United States v. Siddo*, D. Mass. 1:19-cr-10080-NMG, Dkt. 1169 at 2,7 (MTD at **Ex. B**).

### 6. USC's Gift Receipt

Wilson complains that the Film did not mention that he received an "*official USC thank you letter*" for a $100,000 donation to the school. Complaint, ¶ 31(c) (emphasis in original). Additional reporting on the letter would have included the government's allegation that "USC issued this letter without knowing that WILSON's payment was made in exchange for facilitating his son's fraudulent admission to USC as a purported recruit," *Wilson*, Dkt. 732 at ¶ 344 (MTD at **Ex. F**), as well as USC's internal memorandum that "the family was very concerned [the payment] would be made public." Dkt. 736-1, Ex. DDD (MTD at **Ex. M**).

In sum, the gist or sting of the Film as it relates to Wilson is that he was charged with paying bribes to facilitate his children's admission into college. Applying a "common sense

standard of expected lay interpretation," the Film is a privileged fair report of the *Wilson* prosecution, and the Complaint should be dismissed for failure to state a claim as to all plaintiffs, including Mrs. Wilson and John Jr. *Ricci*, 574 F. Supp. at 1568.

**B.       The Film Is Not "Of and Concerning" Mrs. Wilson or John Jr.**

In order to be actionable as defamation, a publication must contain a defamatory statement that is "of and concerning" the plaintiff. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 288, 292 (1964).  This element of the tort contains two components.  The first is whether the plaintiff was identifiable to the audience.  This can be proven by showing "either that the defendant intended its words to refer to the plaintiff and that they were so understood," or that the words "reasonably could be interpreted to refer to the plaintiff and that the defendant was negligent in publishing them in such a way that they could be so understood[.]"  *Eyal v. Helen Broadcasting Corp.*, 411 Mass. 426, 430, 231, 583 N.E.2d 228, 231 (1991).

The second requirement is that the statement about the plaintiff be defamatory *of* the plaintiff.  *See id.* at 433, 583 N.E.2d at 232 ("the context in which the defendants' statement was spoken and received has importance only if the statement itself can be reasonably susceptible of a defamatory meaning as to the [plaintiff]").  *See also Antony v. Duty Free Americas, Inc.*, No. 09-10862-NMG, 2009 WL 10694418 at *2 (D. Mass. Dec. 3, 2009) (libel elements include "1) a false and defamatory communication 2) concerning the plaintiff").

As a general rule, someone "who is not himself libelled cannot recover even though he has been injured by the libel published concerning another.'"  *Church of Scientology of Cal. v. Flynn*, 578 F. Supp. 266, 268 (D. Mass. 1984) (quoting *Gilbert Shoe Co. v. Rumpf*, 112 F. Supp. 228, 229 (D. Mass. 1953).  Statements defamatory of a husband, for example, are not automatically defamatory of his wife, *Hughes v. New Eng. Newspapers Publ'g Co.*, 312 Mass.

178, 180–81, 43 N.E.2d 657, 659 (1942), and statements defamatory of a mother are not automatically defamatory of her son, *Godbout v. Cousens*, 396 Mass. 254, 263–64, 485 N.E.2d 940, 946 (1985).

The Film does not contain any defamatory statements about Mrs. Wilson or her son, nor does the Complaint plausibly allege that it does so. Reporting that a father engaged in illegal activity to benefit his son does not, without more, defame his wife or his son. *Hughes*, 312 Mass. at 180–81, 43 N.E.2d at 659; *Godbout*, 396 Mass. at 263–64, 485 N.E.2d at 946. *See generally* Ezekiel 18:19-20 ("The son shall not suffer for the iniquity of the father, nor the father suffer for the iniquity of the son."). Because the Film contains no defamatory statements that are of and concerning Mrs. Wilson or her son, their claims should be dismissed.[15]

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' complaint should be dismissed.

By their attorneys,

*/s/Jonathan M. Albano*
Jonathan M. Albano, BBO #013850
jonathan.albano@morganlewis.com
Emma D. Hall, BBO #687947
Emma.hall@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Federal Street
Boston, MA  02110-1726
+1.617.341.7700

---

[15] Even assuming that the Film was of and concerning John Jr., the Defendants could fairly report on court records concerning his falsified athletic profile, his father's concerns about him being a "bench warmer side door person" who might be "so weak as to be a clear misfit at practice," and Judge Gorton's order stating that he "was not qualified to play on the varsity water polo team at [USC]," all of which would be privileged. *Wilson*, Dkt. 1510-1 at 12-13 (MTD at **Ex. I**); Dkt 3-4, ¶ 292 (MTD at **Ex. D**); Dkt. 1649 at 2 (MTD at **Ex. L**).

**CERTIFICATE OF SERVICE**

I, Jonathan M. Albano, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 11, 2021.

*/s/Jonathan M. Albano*
Jonathan M. Albano