UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOHN B. WILSON, LESLIE WILSON, and
JOHN B. WILSON, JR.,

      Plaintiffs,

  v.

NETFLIX, INC., NETFLIX WORLDWIDE
ENTERTAINMENT, LLC, 241C FILMS,
LLC, LIBRARY FILMS LLC, JON
KARMEN, and CHRIS SMITH,

      Defendants.

Civil Action No.
1:21-CV-10894-MLW

LEAVE TO FILE GRANTED
ON JULY 2, 2021

**ORAL ARGUMENT REQUESTED**

**PLAINTIFFS' CONSOLIDATED MEMORANDUM IN SUPPORT OF THEIR MOTION
TO REMAND AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ................................................................................ ii

I.      INTRODUCTION .....................................................................................1

II.     BACKGROUND .......................................................................................2

     A.      Factual Background ........................................................................2

          i.      The "Varsity Blues" Prosecution .................................2

          ii.     The Government's Allegations Against Wilson ...........................4

          iii.    The Film .........................................................................5

          iv.     The Wilsons' Pre-Broadcast Letter to Netflix ...........................9

     B.      Procedural Background .................................................................10

III.    ARGUMENT .............................................................................................11

     A.      This Court Must Remand this Action for Lack of Subject Matter
          Jurisdiction Because Johnny Wilson Adequately Pleads a Plausible
          Claim for Defamation and His Status as a Valid Plaintiff Destroys
          Diversity Jurisdiction ...................................................................11

          i.      Defendants Must Satisfy a High Burden to Justify Removal
               of Plaintiffs' Facially Non-Diverse Complaint to Federal
               Court on Diversity Jurisdiction Grounds ...................................12

          ii.     The Film Contains Defamatory Statements and Innuendo
               "Of and Concerning" Johnny Wilson Because It Insinuates
               That He Gained Admission to USC by Pretending To Be a
               Water Polo Player ......................................................................13

          iii.    The Film's Suggestion that Johnny Wilson Gained Admission
               to USC by Pretending To Be a Water Polo Player is Not Protected
               by the Fair Report Privilege Because It Is Not Accurate or Fair ..............16

     B.      In the Alternative, the Court Should Deny Defendants' Motion to Dismiss
          Mr. Wilson's Claims on Fair Report Privilege Grounds Because the Film
          Does Not Accurately or Fairly Report on the Proceedings Against Him ..............20

          i.      The Film Does Not Accurately or Fairly Report on Even the
               Government's Allegations Against Mr. Wilson .......................20

          ii.     Defendants Set Up a Straw Man Argument as to the "Sting"
               or "Gist" of the Film .................................................................22

iii.   The Film Does Not Accurately or Fairly Report on the Proceedings Against Mr. Wilson Because it Omits Critical Exculpatory Information Distinguishing Wilson from Other Parents Portrayed in the Film......................................................................23

IV.   CONCLUSION......................................................................26

# TABLE OF AUTHORITIES

## Cases

*Adelson v. Harris*,
973 F. Supp. 2d 467 (S.D.N.Y. 2013) ........................................................................23

*Brown v. Hearst Corp.*,
54 F.3d 21 (1st Cir. 1995) ........................................................................................15

*Costello v. Ocean Cty. Observer*,
643 A.2d 1012 (N.J. 1994) ......................................................................................19

*Damon v. Moore*,
520 F.3d 98 (1st Cir. 2008) ......................................................................................18

*Dershowitz v. Cable News Network, Inc.*,
Case No. 20-61872-CIV-SINGHAL (S. D. Fla. May 25, 2021) ..................................25

*ELM Med. Lab., Inc. v. RKO Gen., Inc.*,
403 Mass. 779 (1989) ........................................................................................14, 17

*Eyal v. Helen Broad. Corp.*,
411 Mass. 426 (1991) ..............................................................................................13

*Folta v. New York Times Co.*,
2019 WL 1486776 (N.D. Fla. Feb. 27, 2019) ............................................................17

*Good Shepherd Assisted Living Corp. v. Great Am. Ins. Co. of New York*,
2015 WL 2449161 (D. Neb. May 21, 2015) ..............................................................12

*Hack v. Axa Equitable Life INS. Co.*,
No. CV 16-10051-MLW, 2016 WL 5662016 (D. Mass. Sept. 28, 2016) ....................12

*Howell v. Enter. Publ'g Co., LLC*,
455 Mass. 641 (2010) ........................................................................................ passim

*Jones v. Taibbi*,
400 Mass. 786 (1987) ..............................................................................................17

*Joyce v. Globe Newspaper Co.*,
355 Mass. 492 (1969) ........................................................................................19, 22

*Kelleher v. Lowell Gen. Hosp.*,
98 Mass. App. Ct. 49 (2020) ....................................................................................13

*Lasky v. Am. Broad. Cos., Inc.,*
631 F. Supp. 962 (S.D.N.Y. 1986) ................................................................18

*Mabardi v. Boston Herald–Traveler Corp.,*
347 Mass. 411 (1964) ................................................................................14

*Milligan v. United States,*
670 F.3d 686 (6th Cir. 2012) ......................................................................23

*Mills v. Allegiance Healthcare Corp.,*
178 F. Supp. 2d 1 (D. Mass. 2001) .........................................................11, 12

*Morrell v. Forbes, Inc.,*
603 F. Supp. 1305 (D. Mass. 1985) ..............................................................14

*New England Tractor–Trailer Training of Conn., Inc. v. Globe Newspaper Co.,*
395 Mass. 471 (1985) .........................................................................13, 14, 16

*Oort v. DaSilva,*
No. CIV.A. 02-4041, 2004 WL 2070977 (Mass. Super. Sept. 15, 2004) ....................23

*Ravnikar v. Bogojavlensky,*
438 Mass. 627 (2003) .................................................................................13

*Reilly v. Associated Press,*
59 Mass. App. Ct. 764 (2003) ......................................................................14

*Schiavone Const. Co. v. Time, Inc.,*
847 F.2d 1069 (3d Cir. 1988) .......................................................................24

*Stanton v. Metro Corp.,*
438 F.3d 119 (1st Cir. 2006) ...................................................................14, 22

*Universal Truck & Equip. Co v. Southworth-Milton, Inc.,*
765 F.3d 103 (1st Cir. 2014) ........................................................................12

*Whitaker v. Am. Telecasting, Inc.,*
261 F. 3d 196 (2d Cir. 2001) ........................................................................12

## Other Authorities

Restatement (Second) of Torts § 564 (1977) ................................................14, 15, 16, 26

Restatement (Second) of Torts § 611 (1977) .................................................... passim

Restatement (Second) of Torts § 614 (1977) ...................................................................................18

Robert D. Sack,
Sack on Defamation: Libel, Slander, and Related Problems 2–143 (4th ed. 2012) .....................14

## I.       INTRODUCTION

Plaintiffs John B. Wilson ("Mr. Wilson"), Leslie Wilson ("Mrs. Wilson") and their son, John B. Wilson, Jr. ("Johnny Wilson") (collectively, "Plaintiffs" or "the Wilsons"), respectfully submit this memorandum both in support of their motion to remand this action to state court and in opposition to Defendants' motion to dismiss, to the extent the Court reaches that motion.

As a threshold matter, this Court lacks subject matter jurisdiction over this action and must remand it to Massachusetts Superior Court.  Defendants concede that both Johnny Wilson and several of the Defendants are citizens of California.  Such citizenship renders this action non-diverse and deprives this Court of federal subject matter jurisdiction, unless (as Defendants contend) Johnny Wilson somehow fails to state a claim for defamation and therefore should be deemed misjoined and disregarded for purposes of determining diversity jurisdiction.  But Johnny Wilson does more than plausibly allege a claim here.  Under clear Massachusetts law defining the "of and concerning" element of a defamation claim, Johnny has more than adequately pled what a simple review of the offending broadcast reveals – that Defendants published a false and highly misleading portrayal of his alleged involvement in the college admissions scandal in their Netflix film *Operation Varsity Blues: The College Admissions Scandal* ("the Film").  Simply put, the Film includes a focus on Mr. Wilson's son Johnny, and his admission to the University of Southern California and suggests to a person of reasonable intelligence watching it that Mr. Wilson's son was a fake athlete, when in fact Johnny was a nationally competitive water polo player who was an invited member of the United States Olympic Development Program and ultimately made the USC team.  Johnny Wilson is therefore a proper plaintiff in this action, and the Court must remand the action to state court without further consideration of Defendants' motion to dismiss.

Upon making this determination, the Court need go no further.  In the event the Court does reach Defendants' argument for the dismissal of the complaint in its entirety based upon the fair report privilege, that argument too is without merit.  Under equally clear Massachusetts law, where the Film features a false, highly misleading and defamatory portrayal of the allegations and evidence against Mr. Wilson which is neither an accurate nor fair report of the criminal proceedings against him, Defendants are not entitled to the protection of the privilege.  Indeed, the Wilsons warned Defendants before they published the Film that this was the case, provided them with a more complete record of the official proceedings (as well as additional information), and explained that even a defendant awaiting trial in a criminal proceeding and his family enjoy the right not to be defamed; all of which Defendants ignored, rendering their "reporting" false, highly misleading and actionable.

## II.    BACKGROUND

### A.  Factual Background.

The following facts are taken from the Complaint, the exhibits to the Complaint, pleadings filed to the public docket in *United States v. Colburn*, 19-cr-10080, and related matters, and the Film itself, a copy of which Defendants submitted as Exhibit J to their motion to dismiss.[1]

#### i.  The "Varsity Blues" Prosecution.

Mr. Wilson is a defendant in *United States v. Colburn*, 19-cr-10080, which is one of the criminal prosecutions arising from the so-called "Varsity Blues" investigation into allegedly corrupt college admissions practices masterminded by the nationally renowned college admissions advisor William "Rick" Singer ("Singer").  Complaint ("Compl.") ¶ 1.  Beginning in

---

[1] The Complaint and exhibits are contained within the state court record filed at ECF No. 10.

March 2019, the government charged a number of Singer's clients with conspiring with Singer and others to obtain admission for their children to prestigious universities through the use of fraud and bribery. *See* Criminal Complaint in *United States v. Abbott*, 19-cr-10117, at ECF No. 3, attached hereto as <u>Exhibit A</u>. The government alleges that Singer employed two main schemes, and has charged parents with participating in one or both of those schemes. *Id.* at ¶ 6. The first scheme involved cheating on standardized tests by paying a corrupt test proctor to correct wrong answers to artificially inflate the applicant's scores. *Id.* at ¶ 30. The second, known as the "side door" or "recruitment" scheme, involved Singer arranging with college athletic coaches and administrators to falsely designate non-athlete applicants as recruited athletes in order to receive favorable admissions treatment, in exchange for monetary contributions to athletic programs, which the government has labeled as "bribes" (even though in most cases the payments went to university accounts and not to the coaches personally). *Id.* at ¶ 31.

        In most cases, the children of parents who arranged with Singer to use the "side door" did not even play the sport for which they were purportedly being recruited, and there was no intention that they would actually join the team once admitted and enrolled at their chosen school. *Id.* at ¶ 31. The government alleges that this fraud was accomplished in part through the submission of falsified athletic profiles which made the applicants appear to be qualified recruits. In one of the more titillating aspects of the case which received significant media coverage, several parents staged and doctored photos of their children appearing to play sports they did not play for inclusion with their application materials. *Id.*[2]

---

[2] The government alleges generally: "In some instances, parents assisted [Singer] in creating the fabricated profiles, including by supplying staged photographs of their children engaged in athletic activity. In other instances, [Singer] and his associates simply found photos of athletes

## ii. The Government's Allegations Against Wilson.

As is relevant here, the government has charged Wilson with conspiring with Singer to "bribe" Johnny's way into the University of Southern California ("USC") by making a contribution to the USC Men's Water Polo program in exchange for the coach designating him as a "walk on" candidate, which gave him favorable admissions treatment.  *See* Fourth Superseding Indictment ("FSI") in *United States v. Colburn*, 19-cr-10080, at ECF No. 732 ¶¶ 225-244, attached hereto as Exhibit B.  Significantly, in contrast to virtually all of the other children whose parents were charged for participating in the "side door" scheme, Johnny Wilson was not – in the government's words – a "fake athlete".[3]  Accordingly, the government does not accuse Wilson of staging photos of his son playing water polo or engaging in the type of brazen fraud which many of the other parents (including all other "side door" parents featured in the Film) engaged in, and the official public record of the proceedings does not reflect any such allegation.  *See* FSI at ¶¶ 225-244.  To the contrary, the official public record reflects that Johnny was a nationally competitive high school water polo player who was actively pursued by several college programs (including Division I programs), and who ultimately actually joined the men's water polo team at USC.  Compl. ¶ 22.  The government does not dispute any of this, although,

---

on the Internet and either used those photos or used software such as PhotoShop to insert the applicants' faces onto the bodies of legitimate athletes." Ex. A at ¶ 31(f).  No such allegation has been made with respect to Wilson.

[3] *See* Exhibit C, Transcript of February 27, 2020 Status Conference in *United States v. Colburn*, 19-cr-10080, at pp. 16-19 ("these were fake athletes"; "You pay the money. You get in as a fake athlete."; "USC . . . does not have a legitimate admissions process for fake rowers, fake football players, fake pole vaulters, or fake anything[.]").

relying of a novel theory of bribery, it nonetheless maintains that Johnny's admission to USC involved a criminal act.[4]

There is similarly no allegation that Wilson committed fraud with respect to his daughters. *See* FSI at ¶¶ 225-244. Although the government accuses him of a bribery conspiracy for agreeing with Singer to facilitate his daughters' admissions to Stanford and Harvard through large contributions to athletic programs at those schools, the government does not dispute that Singer repeatedly assured Wilson that the admission of non-athlete applicants backed by donations to university athletic programs was a common and accepted fundraising practice so long as the candidates were academically qualified, and they agreed to serve as a team managers or in other support roles. *See* <u>Exhibit D</u> (Transcript of October 15, 2018 call between Wilson and Singer) at pp. 5-6; Compl. Ex. 1 at Ex. D (Affidavit of John Wilson); Compl. Ex. 1 at Ex. F.

### iii.  The Film.

The Film opens with a montage featuring audio of re-enacted calls between various charged parents and Singer. Viewers are informed: "The conversations in this film are real. They are recreations of wiretap transcripts released by the US government. Some conversations have been combined or modified for time and clarity." Motion Ex. J. at 3:48-4:07.[5] At

---

[4] As Defendants point out in their motion, the government alleges that Wilson knew that Singer planned to "embellish" Johnny's athletic profile, and that Singer forwarded a version of Johnny's profile to Wilson that included fabricated awards. FSI at ¶¶ 225-244. But merely embellishing a resume is not a crime, and it is a far cry from the outright fraud that the other "side door" parents portrayed in the film engaged in. The government has not alleged, and there is no evidence, that Wilson reviewed the profile Singer prepared for Johnny or knew that it contained fabricated awards or other false information.

[5] Defendants do not dispute that the Film is presented as a factual account of the charges and evidence against Wilson and other Varsity Blues defendants. Nor could they given that they invoke the fair report privilege.

approximately the 2:00 mark, audio of a call between Singer and Wilson discussing the "side door" begins to play.  At 2:36, while the audio of the Wilson call continues to play, images are displayed on screen of *a male water polo player* in a pool being digitally altered or "photoshopped."  The Complaint alleges, properly and plausibly, that the juxtaposition of the call with Wilson and the image of the male water polo player is an unmistakable suggestion to any viewer, especially all of those viewers who know the Wilsons, that the fake water polo player is Johnny.  Compl. ¶ 29.

After some discussion of Singer's background, the first half of the documentary focuses on six parents who were charged with participating in the "side door" scheme:  William McGlashan, Devin Sloane, Augustin Huneeus, Mossimo Giannulli and Lori Loughlin, and Wilson.  All of the parents featured in the documentary have pleaded guilty and admitted to engaging in criminal activity with the exception of Wilson.  Compl. ¶ 3.

At 16:15, a re-enactment of a recorded call between Singer and McGlashan is depicted, with Singer explaining in explicit terms how he would create a fake athletic profile for McGlashan's son, who was not an athlete, in order to have him admitted to USC as a recruited member of the football team.  Singer tells McGlashan: "*I will photoshop his face onto a kicker . . . . Last year, I had a boy, I made him a long snapper.*"  Motion Ex. J. at 16:15.

Immediately following the re-enactment of the McGlashan call, the film shows Devin Sloane opening a package of water polo equipment he apparently ordered online, and then proceeding to take photographs of his son wearing the water polo gear in their backyard pool.  Singer and McGlashan are then shown joking about how the photos of Sloane's son looked too fake because he was standing on the bottom of the pool rather than treading water like a real water polo player.  *Id.* at 17:10.

At 33:42, a re-enactment featuring Agustin Huneeus is shown.  Huneeus asks Singer to "walk [him] through the whole kind of water polo thing again and how it works."  Singer responds that he is "putting together" Huneeus' daughter's sports profile, and "it will be a water polo profile."  At 35:04, the film cuts to an interview with journalist Billy Witz, who remarks:

> Some of the fake athletes at USC, it seems like it would be hard to miss.  I mean, there was a 5'5" men's basketball player.  Another example is a high school cheerleader who was made to look like a lacrosse player.  There was a water polo player who didn't play water polo in high school.

The film then cuts back to a conversation between Huneeus and Singer, with Singer assuring Huneeus that there is no risk "this thing blows up in [his] face," explaining to Huneeus that "[USC athletic administrator] Donna Heinel essentially puts them on the recruited walk-on list, which happens all the time, and *they just don't show up for practice*, and that's fine."  *Id.* at 36:20.

Finally, the portion of the film focusing on the "side door" scheme concludes with coverage of Mossimo Giannulli and Lori Loughlin, displaying photos of the Giannulli daughters posing for photos on rowing machines, in order to get them admitted to USC as crew athletes when neither of them had any experience rowing crew.  Motion Ex. J. at 40:54.  The film then cuts to an interview with journalist Daniel Golden, who remarks:  "*The scandal did surprise me because it reflected a kind of blatant illegality, you know, bribing college coaches to pretend that their children were athletes when, in fact, they weren't.*"  *Id.* at 45:34.

At 20:50, in the midst of the re-enactments involving McGlashan, Sloane, Huneeus, and Giannulli and Loughlin actively participating in the outright fabrication of athletic profiles for their non-athlete children, the film cuts to a re-enactment of a recorded telephone conversation between Singer and Wilson discussing the use of the side door for Wilson's daughters.  Wilson asks:  "Same kind of deal?  Any sport?  You don't have to play the sport?"  Singer responds:

"That's correct." *Id.* at 21:09.  The Complaint plausibly alleges that this segment, in the midst of the fabrication of athletic profiles being discussed, leaves the viewer with an unmistakable understanding that Wilson was discussing with Singer the same type of scheme concerning his daughters that McGlashan, Sloane, Huneeus, Giannulli and Loughlin participated in, which involved the outright fabrication of athletic profiles to make their children appear to play sports they did not play.  Compl. ¶ 29.  Critically, however, the Film *omits portions of the same conversation* in which Singer explained that the reason Wilson's daughters did not need to "play the sport" is because, according to Singer, they would be permitted to join the teams as student managers or in similar roles in exchange for financial contributions to those teams:

> Wilson: And they don't actually have to do that sport, you're saying.  They could just go in and –
>
> Singer: Correct.
>
> Wilson: -- be like the, uh – the scorekeeper or –
>
> Singer: Corre--
>
> Wilson: -- water boy, water girl.
>
> Singer: Manager or whatever you want to call 'em.  Yeah.
>
> Wilson: Uh, manager, those things.  OK.

Ex. D at pp. 5-6.  Singer's statements during this call, which occurred on October 15, 2018, echoed what Singer had told Wilson in a September 28, 2018 unrecorded call:  that "side door" donations were a legitimate and prevalent aspect of college admissions that allowed schools to fund athletic programs, and that teams were empowered to admit non-athlete applicants with the necessary academic credentials, like Wilson's daughters, in assistant manager-type roles. Compl. Ex. 1 at Ex. D ¶ 7 (Affidavit of John Wilson).[6]  This is very different pitch than the one

---

[6] Critically, in motion practice concerning the government's failure to record this call (which occurred when Singer was working as a government cooperator and which took place during a break in an FBI interview of Singer), the government did not dispute Wilson's sworn account of the call.  Compl. Ex. 1 at Ex. F at pp. 6-7.

Singer made to McGlashan, Sloane, Huneeus, Giannulli and Loughlin, which involved those parents knowingly falsely portraying their non-athlete children as athletic recruits, including going so far as to stage photos of their children pretending to play sports they did not play. *See* Ex. A at ¶¶ 143-147, 195-200, 231-237, and 315-318.   Nonetheless, by omitting this critical context for Wilson's statements and featuring Wilson in the middle of the segment covering the evidence against McGlashan, Sloane, Huneeus, Giannulli and Loughlin, which is *not* what the official records of the criminal proceedings do, the Film's viewers are misled to believe that Wilson participated in the very same scheme as those other charged parents, i.e., that he agreed with Singer to falsely portray non-athlete children as athletes.   This is false because Johnny Wilson was a real water polo player, and because Wilson never agreed with Singer to falsely present his daughters as athletes, but rather for them to serve, legitimately, as team managers or in other support roles as Singer had explained to him in both recorded and unrecorded calls.

### iv.  The Wilsons' Pre-Broadcast Letter to Netflix.

Upon learning that the Wilsons were to be featured in an upcoming Netflix film, the Wilsons wrote to Netflix through counsel to inform them of Wilson's unique situation among the other charged parents and, in particular, to caution them that any suggestion that Johnny Wilson was a "fake athlete" – like the children of other charged parents – would be knowingly false, defamatory, and not a fair or accurate report of the proceedings against Mr. Wilson.  Compl. Ex. 1.   The letter directed Netflix to evidence filed on the public docket in Wilson's criminal proceeding which demonstrates that Johnny Wilson was a nationally competitive high school and club water polo player who became an actual member of the men's water polo team at USC.  *Id.* The letter further directed Netflix to filings which show that Singer in his own notes referred to

Wilson's payment to USC as a "donation to [a] USC program for [a] real polo player."  Compl. Ex. 1 at Ex. C.

With regard to Wilson's daughters' college applications, the letter explained how Singer assured Wilson about the continued propriety of side door donations, including by telling Wilson he was dealing directly with the president of Harvard, and explaining that, in the years since Wilson had used the side door in connection with Johnny's admission to USC, use of the side door had become an even more prevalent method of fundraising, and schools and teams were using it to admit non-athlete applicants with the necessary academic credentials, provided those students worked for the teams as managers or in other support roles.  Compl. Ex. 1 at p. 4.  The letter directed Netflix to the public docket entries backing up these assertions, including a sworn affidavit from Wilson which the government has not controverted.  *Id.*  In fact, Netflix was already aware of this evidence given that one source of such evidence is a recorded call between Wilson and Singer which is featured in the Film, with the exculpatory portion omitted.  *Compare* Motion Ex. J. at 21:09 with Ex. D at pp. 5-6

**B.  Procedural Background.**

The Wilsons filed their Complaint in Massachusetts Superior Court on April 6, 2021. The Defendants removed the case to this Court via a notice of removal filed on May 28, 2021, arguing that although complete diversity exists on the face of the Complaint, Johnny Wilson fails to state a claim for defamation and therefore should be deemed misjoined and disregarded for diversity purposes.  Defendants thereafter moved to dismiss the Complaint in its entirety on June 11, 2021.  The Wilsons now move to remand the case to Superior Court, and in the alternative, oppose Defendants' motion to dismiss.

Given the overlap between Defendants' arguments in support of removal to federal court (which depend on the dismissal of Johnny Wilson as a plaintiff) and the dismissal of the complaint in its entirety, Plaintiffs have elected to address the issues of removal and dismissal in a single memorandum. However, the Court must first consider as a threshold matter whether Johnny Wilson is a proper party to this action, as the existence of federal jurisdiction depends on the resolution of this question. If the Court determines Johnny Wilson is a proper party to this action, it must remand the case to Massachusetts Superior Court without further consideration of Defendants' arguments for dismissal.

## III.   ARGUMENT

### A. <u>This Court Must Remand this Action for Lack of Subject Matter Jurisdiction Because Johnny Wilson Adequately Pleads a Plausible Claim for Defamation and His Status as a Valid Plaintiff Destroys Diversity Jurisdiction.</u>

Defendants do not dispute that Johnny Wilson is a citizen of California, and that several of the Defendants are also citizens of California, meaning that complete diversity of citizenship is lacking if Johnny remains a party to the case.[7] Rather, Defendants argue that the claims asserted in the Complaint on behalf of Johnny Wilson have no "reasonable basis in law and fact," and therefore that Johnny should be deemed improperly joined as a plaintiff and dismissed from the case. *See Mills v. Allegiance Healthcare Corp.*, 178 F. Supp. 2d 1, 4 (D. Mass. 2001). Because the Complaint more than adequately pleads a plausible cause of action for defamation under Massachusetts law on behalf of Johnny Wilson, this Court should reject Defendants' arguments for dismissal of Johnny's claim and remand this case to Massachusetts Superior Court.

---

[7] Defendants do not assert any other basis for federal subject matter jurisdiction other than diversity of citizenship.

i.   **Defendants Must Satisfy a High Burden to Justify Removal of Plaintiffs' Facially Non-Diverse Complaint to Federal Court on Diversity Jurisdiction Grounds.**

In order to sustain their removal of this action to federal court on diversity jurisdiction grounds notwithstanding the conceded absence of complete diversity on the face of the Complaint, Defendants "must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the [P]laintiff[s]' pleadings, or that there is no possibility, based on the pleadings," that Johnny Wilson "can state a cause of action . . . in state court." *Hack v. Axa Equitable Life INS. Co.*, No. CV 16-10051-MLW, 2016 WL 5662016, at *1 (D. Mass. Sept. 28, 2016) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F. 3d 196, 207 (2d Cir. 2001)).  Defendants do not contend that there is anything fraudulent about Plaintiffs' joinder of Johnny Wilson, but instead argue that the Complaint fails to state a cause of action under Massachusetts law on his behalf.  Thus, Defendants must demonstrate by clear and convincing evidence that "there is no reasonable possibility that the state's highest court would find that the complaint states a cause of action upon which relief may be granted" as to Johnny Wilson. *Universal Truck & Equip. Co v. Southworth-Milton, Inc.*, 765 F.3d 103, 108 (1st Cir. 2014).

While this involves what is essentially the same analysis as a motion to dismiss for failure to state a claim, *see, e.g., Mills*, 178 F. Supp. 2d at 4-5, this Court has previously acknowledged an important caveat:  where the state's highest court has not previously addressed the precise legal issue raised by a defendant in arguing that a complaint fails to state a viable cause of action with respect to a non-diverse party, that defendant cannot meet its burden of demonstrating by clear and convincing evidence that there is no possibility that the plaintiff can state a cause of action in state court.  *See Hack*, 2016 WL 5662016, at *3.  This is particularly so where courts in other jurisdictions which have addressed the issue have done so favorably to the

plaintiff.  *See id.* (citing *Good Shepherd Assisted Living Corp. v. Great Am. Ins. Co. of New York*, 2015 WL 2449161, at *2 (D. Neb. May 21, 2015) (rejecting fraudulent joinder argument and remanding case where plaintiff had brought novel claim not yet recognized or rejected by Nebraska courts)).  Thus, *in Hack*, this Court remanded a complaint for negligence against a non-diverse insurance claims administrator, reasoning that where "the courts of Massachusetts have not addressed whether a claims administrator has a duty to an insured and courts in other jurisdictions have found such a duty to exist . . . defendants have not presented clear and convincing evidence that there is no reasonable possibility that the Massachusetts Supreme Judicial Court would find that the complaint states a cause of action against [the non-diverse defendant] on which relief can be granted."  *Id.*  While, as will be demonstrated below, there is ample Massachusetts precedent supporting Johnny's claim, if this Court concludes that the law applicable to his claim is any way unsettled, the Court should conclude that Defendants have failed to meet their high burden to sustain removal and should remand the case to Massachusetts Superior Court.

> **ii.   The Film Contains Defamatory Statements and Innuendo "Of and Concerning" Johnny Wilson Because It Insinuates That He Gained Admission to USC by Pretending To Be a Water Polo Player.**

To state a claim for defamation under Massachusetts law, a plaintiff must allege that the defendant made a false statement to a third party, of and concerning the plaintiff, that is capable of damaging the plaintiff's reputation in the community, and either caused the plaintiff economic loss or is actionable without proof of economic loss.  *Kelleher v. Lowell Gen. Hosp.*, 98 Mass. App. Ct. 49, 52 (2020) (citing *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629-630 (2003)).  Here, Defendants dispute that the Film contains any statements "of and concerning" Johnny Wilson.  Defendants' argument fails because the Film clearly features defamatory statements and

innuendo which reasonably could be interpreted by viewers of the Film to refer to Mr. Wilson's son Johnny Wilson. Nothing more is required.

Under Massachusetts law, a statement need not explicitly refer to the plaintiff to constitute defamation. *See Eyal v. Helen Broad. Corp.*, 411 Mass. 426, 430–31 (1991); *New England Tractor–Trailer Training of Conn., Inc. v. Globe Newspaper Co.*, 395 Mass. 471, 480 (1985); *accord* Restatement (Second) of Torts § 564 cmt. b (1977). "'A plaintiff may establish that the defendant's words were of and concerning the plaintiff by proving at least that the defendant was negligent in publishing words which reasonably could be interpreted to refer to the plaintiff.'" *Reilly v. Associated Press*, 59 Mass. App. Ct. 764, 777 (2003) (quoting *New England Tractor–Trailer*, 395 Mass. at 479); *see also ELM Med. Lab., Inc. v. RKO Gen., Inc.*, 403 Mass. 779, 785 (1989); Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems 2–143 (4th ed. 2012) ("If it can be shown either that the implication of the [statement] was that the plaintiff was the person meant or that he or she was understood to be the person spoken about in light of the existence of extrinsic facts not stated in the article, then [the statement] is 'of and concerning' the plaintiff as though the plaintiff was specifically named."). For example, "[d]efamation can therefore arise from the publication of the plaintiff's photograph in conjunction with a defamatory statement, even in the absence of any express textual connection between the statement and the photograph." *Stanton v. Metro Corp.*, 438 F.3d 119, 128 (1st Cir. 2006) (citing *Mabardi v. Boston Herald–Traveler Corp.*, 347 Mass. 411, 413–14 (1964) and *Morrell v. Forbes, Inc.*, 603 F. Supp. 1305, 1307 (D. Mass. 1985)). "Like the question of whether a communication can reasonably be understood to be defamatory, whether a communication can reasonably be understood to be of and concerning the plaintiff depends on

the circumstances." *Stanton*, 438 F.3d at 128 (citing *New England Tractor–Trailer*, 395 Mass. at 478 n. 5).

Just as there is no requirement that the plaintiff be expressly referred to by name in order to state a claim for defamation, there is no requirement that the offending publication contain any express statements concerning the plaintiff at all. Rather, "defamation can occur by innuendo as well as by explicit assertion[.]" *Reilly v. Associated Press*, 59 Mass. App. Ct. 764, 774 (2003) (quoting *Brown v. Hearst Corp.*, 54 F.3d 21, 25 (1st Cir. 1995)). The "[e]xistence of defamatory innuendo is a question of fact" for the jury. *Id.*

Johnny's admission to USC is at the center of the government's charges against Wilson. *See* FSI at ¶¶ 225-244. While the Film may not refer to Johnny Wilson by name, there can be no serious question that the Film contains statements and innuendo which a reasonable viewer with any knowledge of the Varsity Blues prosecution or who knows the Wilson family would understand to refer to Johnny, and to imply that Johnny was a "fake athlete" whose admission to USC as a water polo player was procured through outright fraud of the variety committed by the other "side door" parents featured in the Film.

Defendants seek to avoid this required application of clear law by setting up a straw-man argument. Defendants suggest that the Complaint asserts that Johnny has been defamed simply by virtue of his familial relationship with his father. *See* Memo. at 19-20 ("Statements defamatory of a husband, for example, are not automatically defamatory of his wife, and statements defamatory of a mother are not automatically defamatory of her son").[8] But that is

---

[8] It bears noting that while statements defamatory of one family member are not automatically defamatory of other family members by virtue of the familial relationship alone, certain statements, like accusations of adultery, are considered to defame more than just the family member to whom they are directed. *See* Restatement (Second) of Torts § 564 (1977), cmt. E ("A statement may be published of a third person under such circumstances as to be defamatory of

not what the Complaint pleads.  Rather, Johnny Wilson pleads that the Film defames him, in addition to his father, insofar as it falsely implies to the viewers that he was a "fake athlete" who needed to pretend to be a water polo player in order to gain admission to USC, when in fact he was a real, nationally competitive water polo player who became a real member of the USC water polo team.  Compl. ¶¶ 2, 20, 22, 28, 29, 45.  Again, it is not necessary that the film identify Johnny by name, so long as the false and defamatory assertions the Film made are capable of causing a reputational injury to Johnny.  To the extent there is any question regarding whether reasonable viewers would understand the film to make reference to Johnny, Johnny is entitled to adduce extrinsic evidence in discovery confirming that fact.  *See, e.g., New England Tractor-Trailer*, 395 Mass. at 480.  Here, he will have little trouble adducing evidence from actual viewers who believed the clear and defamatory innuendo suggested by the Film.

### iii.  The Film's Suggestion that Johnny Wilson Gained Admission to USC by Pretending To Be a Water Polo Player Is Not Protected by the Fair Report Privilege Because It Is Not Accurate or Fair.

Defendants next argue that even if the Film contains defamatory statements of and concerning Johnny Wilson, that those statements are nonetheless somehow protected by the fair report privilege rendering Defendants immune from liability for defamation and requiring the dismissal of Johnny's claim.  This argument too is without merit.  The Film's misleading portrayal of Johnny's involvement with Singer is neither an accurate nor fair report of the government's charges or the evidence against Wilson, insofar as it implies that Johnny was a "fake athlete" who pretended to be a water polo player in order to gain admission to USC.

---

another not named or described.").  The Restatement provides the following common sense illustrations: "A calls B a cuckold in the presence of C.  A has defamed B's wife.  A states to B that C is an illegitimate child.  A has defamed C's mother."  *Id.* at cmt. e, ill. 2 & 3.  Here, by analogy, the accusations leveled against the parents in the Film necessarily implicate (and if false, defame) the children whose college applications were at the center of those accusations.

A report of an official proceeding will receive the protection of the fair report privilege if it is an "accurate and complete or a fair abridgment of the occurrence reported." *Howell v. Enter. Publ'g Co., LLC*, 455 Mass. 641, 652 (2010) (quoting Restatement (Second) of Torts § 611 (1977)). In order to be entitled to the protections of the fair report privilege, the report must be both "accurate" and "fair." *Id.* at 651. "While a report need not be exhaustive, a reporter is not free to omit or misplace facts or make additions that 'convey an erroneous impression to those who hear or read it.'" *Id.* (quoting Restatement (Second) of Torts § 611 cmt. f (1977)). "Determining whether a report is fair and accurate requires a close comparison of the report and the documents and information from which it is drawn." *Folta v. New York Times Co.*, 2019 WL 1486776, at *4 (N.D. Fla. Feb. 27, 2019).

Adopting the formulation set forth in the Restatement (Second) of Torts, the SJC has explained that there are "two sorts of reporting errors: mistakes in reporting what actually happened (accurate), and liberties taken in reporting the character of what actually happened (fair)." *Howell*, 455 Mass. at 663. Inquiry into both prongs focuses on "what message is conveyed to the recipient of the report":

> That is, the accuracy question is whether the reports are sufficiently factually correct such that a reader would not get an erroneous impression of what actually happened. The fairness question is whether the reporter's editorial decisions—such as characterizations, juxtapositions, and choice of focus—would give a reader an erroneous impression about the character of what happened.

*Howell*, 455 Mass. at 662. In other words, a report is accurate if it "conveys to the persons who read it a substantially correct account of the proceedings." *Id.* at 661 (quoting Restatement (Second) of Torts § 611 cmt. f (1977)). It is fair so long as it is not "edited and deleted as to misrepresent the proceeding and thus be misleading." *Id.* at 662.

In assessing whether a report is sufficiently inaccurate or unfair, and therefore not entitled to the protection of the fair report privilege, Massachusetts courts look to whether the "the impact of [the] statement" created a "substantially greater defamatory sting than an accurate report [would have]." *Howell,* 455 Mass. at 662 (quoting *Jones v. Taibbi*, 400 Mass. 786, 795-96 (1987)). *See also ELM Med. Lab., Inc. v. RKO Gen., Inc.*, 403 Mass. 779, 783 (1989) ("A statement is considered a fair report if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced.'" [internal citations omitted]).

Here, as is alleged in the Complaint, the Film does not constitute an accurate or fair report of even *the government's allegations* involving Johnny Wilson, much less the proceedings as a whole. That is because the Film leads a reasonable viewer to believe that Johnny Wilson was a "fake athlete" who pretended to be a water polo player to gain admission to USC – a fact nowhere present in the official record of the criminal proceedings and which was essentially fabricated in the Film. The Film does so by taking excerpts of recorded calls between Singer and Wilson, knowingly stripping them of critical context, and presenting them in the middle of a segment featuring other parents, namely, McGlashan, Sloane, Huneeus, and Giannulli and Loughlin, all of whom were charged with, and pleaded guilty to, making fake profiles with fake pictures which falsely portrayed their non-athlete children as athletes in order to gain admission to USC. "In studying a television program for . . . defamatory meanings, a court must not confine its analysis to the words alone. . . . It is the entirety of the program, both audio and video, that must be considered in determining whether . . . [it] is reasonably susceptible of a defamatory meaning." *Damon v. Moore*, 520 F.3d 98, 105 (1st Cir. 2008) (quoting *Lasky v. Am. Broad. Cos., Inc.*, 631 F. Supp. 962, 970 (S.D.N.Y. 1986)); *see also* Restatement (Second) of Torts §

614 cmt. d ("[T]he context of written or spoken words is an important factor in determining the meaning that they reasonably might convey to the person who heard or read them.").  It is no small matter for Johnny Wilson to have this false and defamatory message about him, i.e., that he was fake water polo player, published to an international audience in the midst of a pandemic when a significant segment of the population is quarantining at home watching Netflix, and he has plausibly pleaded that he has been damaged by this false and defamatory publication.

Although, as Defendants broadly contend, Wilson faces the same criminal *charges* as the other parents portrayed in the Film, this does not give the filmmakers license to mislead the viewers concerning the actual *factual allegations* against Wilson and involving Johnny, which a jury would be entitled to find are fundamentally different in character than the allegations against the other featured parents.[9]  "Embellishing" a resume is not the same thing as having your child pose for staged photographs of them appearing to play a sport they do not play, or photoshopping your child's head onto another person's body.[10]  In contrast to the children of all the other parents portrayed in the film, Johnny was, in Singer's own words, a "real polo player" who actually became a member of the water polo team at USC.  Compl. Ex. 1 at Ex. C.  "The privilege does not give [media defendants] license to garble the facts.  The news story may be lively and filled with human interest, but in all matters [that] materially affect its purport it must

---

[9] Even if Defendants were correct (which they are not) that their inaccurate reporting on the charges and evidence against Wilson did not create any greater reputational injury or "sting" to *Wilson* than the actual charges and evidence, plainly such an argument does not apply to Johnny. Johnny is a real athlete who joined the USC water polo team.  He is not accused of any wrongdoing.  Yet the Film portrays him as being just like the children of the other featured parents, all of whom were "fake athletes" admitted through the use of staged photos and other outright fraud with no intention that they would ever join a USC team.  The portrayal of Johnny in this manner is indisputably defamatory and not a fair report.

[10] Wilson denies that he was aware of any inaccurate information which Singer may have added to Johnny's athletic profile, and the government does not specifically allege that he was so aware.

be correct, for the privilege does not cover false statements of fact nor extend to distorted accounts." *Costello v. Ocean Cty. Observer*, 643 A.2d 1012, 1020 (N.J. 1994). This Court cannot conclude a matter of law at this stage in the proceedings that the Film's implicit portrayal of Johnny as a fake water polo player, who was no different than the rest of the fake athletes portrayed in the Film, did not create a "substantially greater defamatory sting than an accurate report [would have]." *Howell*, 455 Mass. at 662; *see Joyce v. Globe Newspaper Co.*, 355 Mass. 492, 499 (1969) (whether a report is fair and accurate are "questions of fact for the jury if there is a basis for divergent views"). Accordingly, because the Complaint adequately pleads a cause of action for defamation on behalf of Johnny, the Court should reject Defendants' efforts to dismiss Johnny from this suit and, in the absence of complete diversity of citizenship, remand the case to the Superior Court without considering the remainder of Defendants' motion to dismiss.

**B.  In the Alternative, the Court Should Deny Defendants' Motion to Dismiss Mr. Wilson's Claims on Fair Report Privilege Grounds Because the Film Does Not Accurately or Fairly Report on the Proceedings Against Him.**

Even if the Court were to conclude that the Complaint fails to state a claim for defamation on behalf of Johnny Wilson and thus retains jurisdiction over the case, it should nonetheless deny Defendants' motion to dismiss as to Mr. Wilson because the Film is not an accurate or fair report of even the government's allegations against him, much less the proceedings as a whole.

**i.   The Film Does Not Accurately or Fairly Report on Even the Government's Allegations Against Mr. Wilson.**

As discussed above, in order for Defendants to avail themselves of the fair report privilege, the Film must be an accurate and fair report of the proceedings against Wilson. Putting to one side whether the filmmakers had a duty to include uncontradicted exculpatory information which is included in the public record of the proceedings in order for the film to

constitute a fair report (a topic to be addressed below), the Film is not even an accurate and fair report of the government's allegations against Wilson.

With regard to the government's charges against Wilson surrounding Johnny's admission to USC, it is undisputed that, unlike all of the other "side door" parents featured in the Film, Wilson is not accused of, and did not engage in, photoshopping or staging of photos or other similar conduct involving falsely portraying non-athlete children as athletes.[11]  But as explained above, the Film plainly insinuates that Wilson engaged in precisely this conduct, by displaying video of a water polo player being photoshopped in the opening credits while an audio re-enactment of a call between Singer and Wilson is played, and later, by placing re-enactments of other calls between Wilson and Singer in the middle of a sequence which portrays McGlashan, Sloane, Huneeus, Giannulli and Loughlin actively participating is this brazen fraud.  Again, particularly when dealing with medium of film, context is key.  The question for the Court is whether the Defendants' "editorial decisions—such as characterizations, juxtapositions, and choice of focus" are capable of creating in the mind of a reasonable viewer "an erroneous impression about the character of what happened." *Howell*, 455 Mass. at 662.  Just because the Film features Wilson's own words (in the form of re-enactments of recorded phone calls) does not mean that the Film is incapable of sufficiently misleading the viewers so as to place the film's portrayal of Wilson beyond the protections of the fair report privilege.  Nor, for the reasons discussed below, can these errors in the Film's reporting of the charges against Wilson be excused on the basis that accurate reporting would have produced no greater "sting" or reputational injury to Wilson.

---

[11] Nor do the government's allegations involving Wilson's daughters include any accusation that he planned to photoshop or stage photos of them appearing to play sports they did not play.

### ii. Defendants Set Up a Straw Man Argument as to the "Sting" or "Gist" of the Film.

Defendants do not contest that the government has not accused Wilson of falsely portraying Johnny as playing a sport he did not play.  Nor can they contest that this fact distinguishes him from all of the other "side door" parents featured in the Film.  Instead, trying to cast the gist of the Film at the broadest possible level, Defendants argue that an alleged fraud is an alleged fraud even if they got many of the facts wrong and failed to make clear in a meaningful way or until it was too late that Mr. Wilson was the one parent in the Film who has not pleaded guilty.[12]  Memo. at 18-19.  Such an argument is unavailing.  There is a material difference in the harm caused to Mr. Wilson's reputation by, on the one hand, the Film merely reporting he is part of the Varsity Blues prosecution alleging fraud, and, on the other hand, affirmatively suggesting his conduct was the same as parents who have already pleaded guilty to faking athletic profiles for their non-athlete children or participating in standardized test cheating.  Mr. Wilson submits that there is at a very minimum "a basis for divergent views" on this point. *Joyce*, 355 Mass. at 499.   Accordingly, this Court cannot conclude as a matter of law on a motion to dismiss that the Film's insinuation that Wilson falsely portrayed his son playing a sport he did not play did not create a "substantially greater defamatory sting than an accurate report [would have]." *Howell,* 455 Mass. at 662.

---

[12] Contrary to Defendants' contention, Motion at 11, the "status update" at the conclusion of the ninety minute Film reporting that Wilson has pleaded not guilty is not a sufficient antidote to the otherwise false and defamatory portrayal of the charges and evidence against him because it cannot be presumed a viewer will even make it that far into the film. *See Stanton*, 438 F.3d at 127-28 (plaintiff stated claim for defamation based on use of her image in story on teenage sexual promiscuity despite disclaimer in small print that individuals in photographs were not related to story, where reasonable readers could overlook disclaimer).

iii.   **The Film Does Not Accurately or Fairly Report on the Proceedings Against Mr. Wilson Because It Omits Critical Exculpatory Information Distinguishing Wilson from Other Parents Portrayed in the Film.**

Defendants argue that so long as the Film accurately and fairly reports on the government's *allegations* against Wilson (which it does not, for the reasons explained above), it is entitled to the protections of the fair report privilege regardless of whether it omitted uncontroverted exculpatory evidence available in the public record which places the government's allegations against Wilson in a very different light.  If the Film purported to report *only* on the government's *allegations* against Wilson, Defendants' argument might be correct. But the Film clearly goes beyond reporting on the government's allegations, and instead presents *evidence* which has been made available in the case—principally, transcripts of recorded telephone calls between Singer and various charged parents which have been introduced into the public record.[13]   As such, in order for the film to be an "accurate and complete or a fair abridgement of the occurrence reported," Restatement (Second) of Torts § 611 cmt. f (1977), Defendants were obligated not to give a "one-sided account of the proceeding" but to provide a "fair abridgement" of the evidence pertaining to Wilson.  *See, e.g., Milligan v. United States*, 670 F.3d 686, 697 (6th Cir. 2012); *Adelson v. Harris*, 973 F. Supp. 2d 467, 486 (S.D.N.Y. 2013), aff'd, 876 F.3d 413 (2d Cir. 2017).  This is particularly so where the Film purports to be a "documentary" providing a factual account of the charges and evidence against Wilson. Defendants failed to do so.

---

[13] Indeed, the Film goes even further than reporting on evidence made public as part of the proceedings.  It includes sit down interviews with Stanford sailing coach John Vandemoer (who pleaded guilty in a related case) and his attorney Rob Fisher, and presents previously non-public information which is exculpatory of Vandemoer.  *See, e.g.*, Motion Ex. J at 26:18, 27:38, 1:27:12.  Despite this, Defendants declined to present any information exculpatory of Wilson, whether part of the public record of the proceedings, or in the case of the comprehensive results of Wilson's polygraph examination, which the Wilsons supplied to Netflix in advance of the broadcast.  *See* Compl. Ex. 1

In *Oort v. DaSilva*, No. CIV.A. 02-4041, 2004 WL 2070977 (Mass. Super. Sept. 15, 2004), then-Superior Court Judge Gants recognized that "the omission of important exculpatory information may mean that a news article is not 'a fair abridgement of the occurrence reported.'" *Id.* at *6. Justice Gants explained:

> When a news article simply declares that an individual has been arrested for a particular crime, no exculpatory information need be included in the article because no inculpatory information has been included. *When, as here, the news article provides details as to the commission of the crime, the obligation of a reporter to the reading public is similar to that of the prosecutor to a grand jury-she may not conceal information that so greatly undermines the information published as fundamentally to distort a reasonable reader's understanding of the gist of the police report.*

*Oort v. DaSilva*, No. CIV.A. 02-4041, 2004 WL 2070977, at *6 (Mass. Super. Sept. 15, 2004) (emphasis supplied). Applying similar reasoning, the Third Circuit held that a magazine article reporting on an FBI memorandum concerning the investigation into Jimmy Hoffa's death was not a fair report where the article reported that the memorandum stated that the plaintiff's name was mentioned several times in FBI reports on Hoffa's death, but omitted that the memorandum also noted that "none of these [mentions] suggested any criminality, or organized crime associations." *Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069 (3d Cir. 1988). The court reasoned that "the deletion of the exculpatory language altered considerably the fairness of the report and seems to fall squarely into Restatement (Second) § 611 comment f[,]" which provides that "it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it, *as for example a report of the discreditable testimony in a judicial proceeding and a failure to publish the exculpatory evidence*." *Id.* at 1088 (quoting Restatement (Second) of Torts § 611 cmt. f (1977)) (emphasis supplied).

Here, prior to the release of the Film, the Wilsons put the Defendants on notice of several pieces of uncontroverted exculpatory evidence contained within the public record of the

proceedings against Wilson.   This evidence includes, without limitation, that:  1) Johnny Wilson was a nationally competitive high school and club water polo player who was pursued by college teams and became a member of the USC men's water polo team; 2) Singer himself described Johnny's admission to USC as involving a "donation to [a] USC program for [a] real polo player"; and 3) Singer repeatedly told Wilson (including in an unaired portion of a call featured in the film) that Singer's daughters could take advantage of the side door without needing to actually play a sport so long as they were academically qualified and agreed to serve as team managers or in other support roles.   In disregarding and omitting this and other exculpatory information, Defendants deprived the Film's viewers of critical context which separated Wilson from all of the other featured "side door" parents.

Moreover, Defendants' transgressions go beyond a failure to include exculpatory evidence necessary to make the Film a "fair abridgement" of the proceedings against Wilson. Even the evidence which is featured in the Film is edited in such a way so as to create "an erroneous impression about the character of what happened."   *Howell*, 455 Mass. at 662.   As discussed in section II.A.iii above, through highly misleading editing, the Film creates the impression that Wilson agreed with Singer to have his daughters admitted to Stanford and Harvard as recruited athletes even though they didn't play the sport, when in reality, *during an omitted portion of the very same call featured in the film*, Singer made clear that the reason Wilson's daughters did not need to "play the sport" is because they would be expected to work for the teams as assistant managers or in other support roles.   *Compare* Motion Ex. J. at 21:09 with Ex. D at pp. 5-6.   This is a fundamentally different "pitch" than the one Singer gave to McGlashan, Sloane, Huneeus, and Loughlin and Giannulli, in which their children would be falsely portrayed as playing sports they did not play.   *See, e.g.*, Motion Ex. J. at 16:15 ("I will

photoshop his face onto a kicker . . . . Last year, I had a boy, I made him a long snapper."). Yet a reasonable viewer is led to conclude that this is precisely the sort of thing that Wilson was agreeing to in the subject call. This is exactly the type of unfair editing which under the law renders the film's portrayal of Wilson not a fair report. *See Dershowitz v. Cable News Network, Inc.*, Case No. 20-61872-CIV-SINGHAL, ECF No. 28 (S. D. Fla. May 25, 2021) (report of lawyer's argument during senate impeachment trial not a privileged fair report where it omitted a critical qualifier, making lawyer's position seem more extreme than it was). Defendants are not entitled to the protection of the fair report privilege.

## IV.   CONCLUSION

For the reasons stated in section III.A, Plaintiffs respectfully request that this Court remand this action to state court. In the alternative, if the Court retains jurisdiction over this action, for the reasons stated in section III.B, Plaintiffs nonetheless request that the Court deny Defendants' Motion to Dismiss.[14]   Plaintiffs respectfully request that the Court hold oral argument on both motions.

---

[14] Defendants also argue that the Film does not contain any defamatory statements of and concerning Mrs. Wilson. Because it lacks subject matter jurisdiction, the Court need not reach this issue. However, the Complaint adequately makes out a claim that Mrs. Wilson is defamed by virtue of her relationship to Mr. Wilson and Johnny Wilson. *See* Restatement (Second) of Torts § 564 (1977), cmt. E ("A statement may be published of a third person under such circumstances as to be defamatory of another not named or described.").

JOHN B. WILSON, LESLIE WILSON, and
JOHN B. WILSON, JR.,

By their attorneys,


*/s/ Howard M. Cooper*
Howard M. Cooper (BBO # 543842)
hcooper@toddweld.com
Christian G. Kiely (BBO # 684308)
ckiely@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

Dated:  July 9, 2021




## CERTIFICATE OF SERVICE

I, Christian G. Kiely, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).



*/s/ Christian G. Kiely*
Christian G. Kiely

Dated: July 9, 2021