UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                )
JOHN B. WILSON, et al.,         )
                                )          Civil Action
          Plaintiffs,           )          No. 21-10894-MLW
                                )
v.                              )
                                )
NETFLIX, INC., et al.,          )
                                )
          Defendants.           )
                                )
```


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


VIDEOCONFERENCE
MOTION HEARING


August 18, 2021
2:15 p.m.


John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1   APPEARANCES:

2   Counsel on behalf of Plaintiffs:
    Howard M. Cooper
3   Christian Kiely
    Todd & Weld
4   One Federal Street
    27th Floor
5   Boston, MA 02110
    617-720-2626
6
    Counsel on behalf of Defendant:
7   Jonathan M. Albano
    Emma D. Hall
8   Morgan Lewis & Bockius LLP
    One Federal Street
9   Boston, MA 02110
    617-951-8360

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2           THE COURT:  Good afternoon.  Would the clerk please
3      call the case.
4           COURTROOM CLERK:  This is Civil Action 21-10894, John
5      B. Wilson, et al. v. Netflix Worldwide Entertainment, LLC, et
6      al.
7           THE COURT:  Good afternoon.  I apologize for the delay
8      in starting.  Would counsel please identify themselves for the
9      Court and for the court reporter.
10          MR. COOPER:  Good afternoon, Your Honor.  Howard
11     Cooper for the plaintiffs.  With me is my colleague Christian
12     Kiely, and I believe my clients are together and listening on
13     mute.
14          THE COURT:  Okay.
15          MR. ALBANO:  Good afternoon, Your Honor.  John Albano
16     for the defendants, and with me is my colleague Emma Hall.
17          THE COURT:  Okay.  In this case the plaintiffs, John
18     Wilson, John Wilson Jr. and Leslie Wilson, allege that a
19     Netflix film, Operation Varsity Blues - The College Admissions
20     Scandal, defamed each of them.
21          I'm recounting this, A, to make sure that I have this
22     clear but to try to assure that everybody understands the
23     context of this.  This case was brought in the Massachusetts
24     Superior Court.  It was timely removed to this court based on
25     alleged diversity of citizenship.
```

1          Several of the defendants are citizens of California.

2     John and Leslie Wilson are citizens of Massachusetts, however

3     the defendants acknowledge that John Wilson Jr., who the

4     parties sometimes refer to as Johnny, is also a citizen of

5     California.  The defendants allege that John Wilson Jr. is

6     fraudulently joined as a plaintiff or improperly joined as a

7     plaintiff and should be disregarded for determining whether

8     diversity of citizenship jurisdiction exists.

9          In my June 2 order I raised the question of whether

10    diversity of jurisdiction exists, and if I don't have

11    jurisdiction, I can't hear the case even if the parties agree

12    or want me to.  So as I said, it's necessary to decide whether

13    this court has jurisdiction before deciding any matter on the

14    merits, including the now pending motion of the defendants to

15    dismiss.

16         The plaintiffs have filed a motion to remand to state

17    court.  The parties have briefed it, and I will hear argument

18    on that now.  If I do remand the case to state court, it will

19    be up to the state court to decide the motion to dismiss.

20         If John Wilson Jr.'s claims are promptly dismissed by

21    the state court, it's my understanding that within one year of

22    the original filing of this complaint, which I believe was in

23    April of 2021, the defendants could remove the case again.

24    That's pursuant to 28 United States Code, Section

25    1442(b)(2)(C)(3).

1          So I'll decide the motion to remand now, today or
2     hopefully soon.  And if I do decide to remand it, it will go
3     back to the state court, and it is conceivable I would see you
4     again.  Is that a fair summary of what I've addressed so far?
5          MR. COOPER:  Yes, Your Honor.
6          MR. ALBANO:  Yes, Your Honor.
7          THE COURT:  Thank you.  Then let me ask you some
8     questions that I think I know the answer to but I may not
9     because I want to try to really focus on what's in dispute
10    here.  So with regard to the standard, the legal standard for
11    remand, both parties cited my discussion of it in *Hack*, 2016
12    Westlaw 5662016.  Do the parties agree that that's a correct
13    statement of the applicable standard?
14         MR. COOPER:  I do, Your Honor.
15         MR. ALBANO:  I do, Your Honor.  I would add I think
16    it's consistent with the other cases that we cited in the
17    district on the standard applicable.
18         THE COURT:  Yes, and there's the First Circuit
19    *Universal* case, which I quoted extensively.  All right.
20         MR. COOPER:  Also, Your Honor, the *Mills* case from
21    Judge Saris is worth I think pointing out that also is
22    consistent, *Mills v. Allegiance Healthcare*.
23         THE COURT:  Okay.  And then I think you're in
24    agreement and I believe it's correct that the fraudulent
25    joinder, while it usually arises with allegedly fraudulently

1    joined defendants, also applies when it's asserted that the

2    plaintiff, a plaintiff has been fraudulently joined, not --

3    improperly joined may be a more precise or fair way to

4    characterize it in the context of this case.  Am I right?

5              MR. COOPER:  No, we don't agree with that, Your Honor.

6              THE COURT:  What's that?

7              MR. COOPER:  From the plaintiffs' perspective, when

8    given the opportunity to argue, I will explain that the issue

9    identified by the Court raised by the *Breland Homes v. Wrigley*

10   case really governs here.  We think that for the reasons in

11   that case that I can go into, plus an additional reason that I

12   don't see discussed anywhere, that the fraudulent joinder issue

13   should be limited to a misjoined non-diverse defendant.

14             THE COURT:  Is that a position you took in your

15   papers?  Because as I read the papers, I thought that initially

16   you took the position that it was equally applicable to

17   plaintiffs in a footnote.

18             MR. COOPER:  So, Your Honor, before the Court

19   identified the Northern District of Alabama case, we did what

20   most courts and litigants do, namely assumed the applicability,

21   although the overwhelming number of cases analyze the issue

22   from a defendant-being-joined perspective.

23             In our answer to the Court's questions which we styled

24   as a supplemental memo, we made clear that we think that

25   Justice Smith in the *Breland Homes* case got it right and that

1    the beginning and end of this should be the application of that

2    rationale and that holding to this case.

3         THE COURT:  All right.  Now I see that in footnote 1

4    of your supplemental submission, docket number 30.  Am I

5    correct that earlier on you wrote that it did apply?  I mean,

6    in an earlier submission.

7         MR. COOPER:  In our original opposition, Your Honor,

8    we did assume that it applied, yes.

9         THE COURT:  You cited some cases for that proposition.

10   Okay.  Well, I'll tell you, my tentative view is even though I

11   brought the issue to your attention and it's all tentative, is

12   that there's no logical reason it shouldn't apply to plaintiffs

13   as well as defendants and does, but I want to hear from you on

14   it.  Although it raises another issue, and that is whether this

15   is another question on which the defendants should be required

16   to provide clear and convincing evidence that there's no --

17   it's not possible that your present position is right, but I

18   don't think that's going to be outcome-determinative.  But

19   that's why I'm asking these questions, to either confirm or

20   clarify my understanding.

21        So I think, having read all of the briefing, that I

22   should apply Massachusetts law rather than California law.  I

23   actually think that California -- if you hadn't done

24   substantial briefing based on Massachusetts law, until I raised

25   this issue, I think I would find that California law governs

John Wilson Jr.'s claim, but I haven't studied that -- well, I

might want to study that more, but I think you agree, A, the

outcome should be the same whether I apply Massachusetts law or

California law.

　　　　And since I think you agree that Massachusetts law

applies, and that's reasonable since the choice of law is

complicated, I can go along with your agreement as the First

Circuit said in *Llubers,* 663 F.3d 6, 23, and as the First

Circuit said in the *Okmyansky* case, 415 F.3d 154, 158, if the

outcome will be the same whichever law applies, in effect I can

use Massachusetts law.  So is anybody advocating that I apply

California law?

　　　　MR. COOPER:  No, Your Honor.

　　　　MR. ALBANO:  Your Honor, if I might just fine-tune our

position.  Our position is, as you said, not outcome-

determinative.  The law of the two states on fair report is

equivalent, and the only additional fact I would add is that

our position is that California law applies as to John Jr.'s

claim but that it doesn't matter because the law is similar, so

our view is you could cite cases and rely on cases from either

jurisdiction.  As the SJC has said, the laws are comparable.

　　　　THE COURT:  Okay.  We can see it if makes a

difference.  It's my present intention to apply Massachusetts

law, and my current conception, it's more favorable to the

defendants than Massachusetts law because -- well, under

1    California law the fair report privilege applies to journals as

2    I understand it at the moment.  And I've got a question as to

3    whether this Netflix Film would be considered a journal or it

4    should be considered a journal, and that might be another issue

5    you have to convince me there's no possibility you would lose

6    on it.

7            So I've read the California cases, many of them, and

8    Massachusetts cases.  I think I'll probably analyze it under

9    Massachusetts law, but I don't discern any material difference

10   between them.

11           So my understanding of defamation under Massachusetts

12   law, as the elements are described by the Supreme Judicial

13   Court in *Flagg*, 486 Mass. 23, 37, is that, "Under Massachusetts

14   law, in order to state a claim of defamation, a plaintiff must

15   allege facts indicating that, one, the defendant published a

16   false statement regarding the plaintiff, that is the defendant

17   communicated the statement concerning the plaintiff to a third

18   party; two, the statement could damage the plaintiff's

19   reputation in the community; and three, the statement caused

20   economic loss which was otherwise actionable without proof of

21   economic loss," which I don't understand anybody argued that

22   it's not -- if the statements are defamatory or could possibly

23   be found to be defamatory, nobody has argued that there needs

24   to be proof of economic loss to my knowledge.

25           As I also understand it, under either state's laws,

1    the First Amendment requires the defamatory statements to be of

2    and concerning the plaintiff, and here John Wilson Jr.  And

3    there is a California case for that proposition, *Blatty*, 42

4    California 3d. 1033, 42, and the First Circuit found the same

5    in *Flotech*, 814 F.2d 775, 778.

6           So have I correctly and succinctly stated the law with

7    regard to defamation?

8           MR. COOPER:  So Your Honor, with the understanding

9    that applicable to those elements, including the of and

10   concerning and the defamatory statement, there are additional

11   ways to get this through innuendo, for example, in *Rielly v.*

12   *Herald* and the like.

13          THE COURT:  Yes, I understand that.  I'm trying to do

14   this at a fairly high level.

15          MR. COOPER:  Understood, you have correctly stated the

16   elements of defamation, Your Honor --

17          MR. ALBANO:  The only addition -- excuse me.

18          MR. COOPER:  -- not relevant here is that we would

19   contend that the plaintiffs are private figures so there needs

20   to be proof of negligence as opposed to there being public or

21   limited purpose public figures requiring actual malice, but

22   that is not an issue at this point in the case.

23          THE COURT:  Okay.

24          MR. ALBANO:  If I may, Your Honor.

25          THE COURT:  Mr. Albano.

1          MR. ALBANO:  Yes.  I agree with what Mr. Cooper just

2     said, that the public/private figure status is not at issue in

3     the motion currently before the Court.  And the only addition I

4     would make to Your Honor's summary of the law of defamation in

5     Massachusetts is that those elements apply except as to

6     privileged statements.

7          THE COURT:  That's where I'm going.  Let me ask this.

8     Do the defendants still allege that the allegedly defamatory

9     statements are not of and concerning John Jr.?

10         Because the plaintiffs point out that that was raised

11    initially maybe in the notice of removal but not argued in the

12    memoranda with regard to remand.

13         MR. ALBANO:  That is still our position, Your Honor.

14    I believe the way it came up with the plaintiffs is because I

15    did not, we did not raise it in our reply brief, they thought

16    that the issue was gone.  My view was it didn't need to be

17    addressed in the reply brief as it had been addressed before.

18         THE COURT:  All right.  I'm trying to get this

19    clarified and that helps.  So as I understand it -- well, am I

20    correct in understanding that essentially there are two issues,

21    maybe there are three issues, but two issues.

22         One, whether the statements, whether the film, to the

23    extent it concerned the Wilsons, was of and concerning John

24    Wilson Jr.  And then the second issue would be are the

25    defendants protected by the fair report privilege.  Are those

1    the two issues I need to decide?

2         MR. ALBANO:  From the defense perspective, yes.

3         MR. COOPER:  And the way I think we get there is

4    there's a threshold issue, which I will briefly argue to Your

5    Honor under the *Breland Homes* case.

6         THE COURT:  Under which case?

7         MR. COOPER:  The *Breland Homes* case.

8         THE COURT:  All right.

9         MR. COOPER:  After that, there is the standard with

10   regard to the issue of alleged fraudulent joinder or misjoinder

11   under Massachusetts law, and the argument then does go to the

12   two issues raised by the defendants, the of and concerning

13   issue, and then the fair report privilege issue as to Johnny

14   only.  And then thereafter, Your Honor, if you were to decide

15   in Johnny's favor, you need not go further.

16        THE COURT:  I can't go further.

17        MR. COOPER:  You can't go further.

18        THE COURT:  I won't have jurisdiction.

19        MR. COOPER:  Then there are additional arguments as to

20   the fair report privilege, which is what is raised as to

21   Mr. Wilson and his wife.

22        THE COURT:  Yeah.  It's not my intention to hear

23   argument on the motion to dismiss today.  If I decide not to

24   remand, we'll do that at another time, I expect.

25        MR. COOPER:  I would just note that with respect to

1    Mr. Albano's comment in opposition to our motion to remand,

2    there was no argument about the of and concerning, which is why

3    we thought it had been abandoned.  That argument is in his

4    client's motion to dismiss, not the motion to remand.

5         THE COURT:  Which I think, though, he incorporated the

6    motion to dismiss in his memo on remand.  This is what I'm

7    trying to get clarified.

8         MR. COOPER:  I'm prepared to argue, Your Honor, so

9    yes, we can do that.

10        THE COURT:  And with regard to the fair report

11   privilege standard, I know there are other cases amplifying or

12   addressing this, is the fair report privilege standard under

13   Massachusetts law as stated in *Howell*, 920, N.E. 2d, 1 at 14

14   and further at 21, but on 14, the Supreme Judicial Court says

15   that the fair report privilege in Massachusetts is as stated in

16   the Restatement Second of Torts, section 611, which says, "The

17   publication of a defamatory matter concerning another in a

18   report of an official action or proceeding or of a meeting open

19   to the public that deals with a matter of public concern is

20   privileged if the report is accurate and complete or a fair

21   abridgement of the occurrence reported."  Is that the general

22   standard?

23        MR. COOPER:  I have a slight twist on it, Your Honor,

24   but yes, the SJC in *Howell* actually refers to comment F of the

25   Restatement Second of Torts at 611.  And comment F, which is

1    headed Accuracy and Fairness of Reporting, contains four

2    paragraphs of language, the second of which I think is

3    important to bring to the Court's attention since that is where

4    the SJC was saying the privilege is codified.  It's somewhat

5    long, and I will only read it if the Court wants me to, but I

6    will be referring to it in the argument.

7         THE COURT:  All right.  I'll ask my law clerk to get

8    me the Restatement, which I think is not printed out.

9         MR. ALBANO:  Your Honor, may I raise one issue here on

10   *Howell*?

11        THE COURT:  Yes.

12        MR. ALBANO:  It is true that the Supreme Judicial

13   Court has often cited Restatement 611 in its very core cases.

14   It does not, though, track it as if it was a statute.  For

15   example, the excerpt that Your Honor just read included a

16   statement in the Restatement that the privilege applies to

17   proceedings open to the public.  The SJC held in *Howell* that

18   the Massachusetts privilege was not so limited.

19        Similarly, the SJC and the First Circuit have

20   frequently referred to the fair report privilege as requiring a

21   rough and ready summary of the proceeding and is protected as

22   long as the gist or sting of the publication is consistent with

23   that of the record.

24        THE COURT:  Well, I mentioned page 21 of *Howell* which

25   the plaintiff -- well, page 21 of *Howell* that has that exactly.

1    "The report need only give a rough and ready summary that is

2    substantially correct in order to qualify for the fair report

3    privilege.  The statement is considered a fair report if its

4    gist or sting is true, that is, if it produces the same effect

5    on the mind of the recipient which the precise truth would have

6    produced."  That's the type of language that you were referring

7    to, Mr. Albano?

8            MR. ALBANO:  Exactly, Your Honor.  Thank you.

9            THE COURT:  But I'll note that the Supreme Judicial

10   Court also said on the same page citing comment F to section

11   611 of the Restatement, "While a report need not be exhaustive,

12   a reporter is not free to admit or misplace facts or make

13   additions" --

14           MR. COOPER:  Your Honor, that language appears in the

15   middle of the paragraph that I was going to read to you.

16           THE COURT:  -- "that convey an erroneous impression of

17   those who hear or read it."  As I'll tell you shortly, I think

18   "additions" may be a meaningful word for the pending motion.

19           And then it goes on to say, "That is, the accuracy

20   question is whether the reports are sufficiently factually

21   correct, such that a reader would not get an erroneous

22   impression of what actually happened."

23           And I'm saying these in part -- from my understanding,

24   without disparaging anybody else, I think I have the two

25   leading First Amendment lawyers in Massachusetts arguing.  You

 1   do this all the time.  One of these cases, maybe this one

 2   was --

 3           MR. COOPER:  Most of the cases --

 4           THE COURT:  What's that?

 5           MR. COOPER:  Most of the arguments that I spent

 6   reading were Mr. Albano's arguments.

 7           THE COURT:  Yes, I noticed.  He was in most of the

 8   cases.  All right.  My law clerk should print and give to my

 9   secretary F, please.

10           MR. COOPER:  I think we agree, Your Honor, that the

11   gist and the sting of the standard as you've articulated it is

12   correct.

13           THE COURT:  Okay.  And then I think you both agree

14   that no discovery is necessary or appropriate.  The defendant

15   is making a sufficiency challenge to the complaint in effect,

16   right?

17           MR. ALBANO:  Yes, Your Honor.

18           MR. COOPER:  I would say, Your Honor, the sole

19   possible exception to that is the removal standard actually

20   invites extrinsic evidence, and if Mr. Albano is going to rely

21   on the of and concerning element, we would be prepared to

22   proffer evidence that watchers of the documentary understood

23   that Johnny Wilson was being referred to as a fake water polo

24   player.

25           THE COURT:  Well, okay.  I don't have it in front of

1    me.  My goal was to decide this matter today or tomorrow

2    orally.  I don't know whether it will be achieved, but this

3    goes back to the standard in *Hack*.  The burden is on the

4    defendant to show there's no reasonable possibility that the

5    Massachusetts courts would find that John Wilson Jr. was

6    defamed.

7            But that goes to the next point I was going to raise.

8    I can consider all of the evidence the parties submitted.  I

9    discuss this in *Hack*.  I'm not on a motion to dismiss limited

10   to the complaint and things referenced or incorporated, so I

11   can at least consider the voluminous documents you have given

12   me, right?

13           MR. COOPER:  Yes, Your Honor.

14           MR. ALBANO:  Yes, Your Honor, I agree.

15           THE COURT:  All right.  Well, I was going to start

16   because the burden is on him, with Mr. Albano, but do you want

17   to present your argument, Mr. Cooper, on whether the fraudulent

18   joinder doctrine applies to plaintiffs as well as defendants?

19           MR. COOPER:  I think that makes sense, Your Honor, and

20   since it's our motion to remand, I actually assumed I would be

21   going first.

22           THE COURT:  Okay.  We'll see, but go ahead.

23           MR. COOPER:  Okay.  So briefly, Your Honor, the

24   *Breland Homes v. Wrigley* decision written by Judge Smith from

25   the Northeastern District of Alabama in 2019 addresses an issue

1    which I think it can fairly be said had remained unaddressed

2    meaningfully by any court that was considering a remand motion

3    that involved an allegedly improperly or -- fraudulent doesn't

4    apply here, so I'm just going to say misjoined plaintiff who

5    was nondiverse.

6            I'd like to start with one of the things that Judge

7    Smith didn't rely on, and that is that the removal statute at

8    28 USC 1441(b), removal based on diversity of citizenship,

9    says, "In determining whether a civil action is removable on

10   the basis of jurisdiction under 1332(a), the citizenship of

11   defendants sued under fictitious names shall be disregarded."

12   It says "defendants."  It does not say "plaintiffs."

13           The fictitious names I believe refer to the misjoined,

14   fraudulently joined defendants, and I would argue first as a

15   threshold matter under the plain language of the statute it

16   can't be applied to an allegedly misjoined plaintiff, and that

17   then feeds into what Judge Smith was concerned with.  Number

18   one, ambiguity with regard to the removal statute is to be

19   construed against removal.  You wrote that in your *Hack*

20   decision, Your Honor, and the First Circuit in *Robello-Gonzalez*

21   *v. Calderon-Cera,* 398 F.3d 1 --

22           THE COURT:  Is this a case you've cited?

23           MR. COOPER:  I believe it is, Your Honor.

24           THE COURT:  What's it called?

25           MR. COOPER:  *Robello-Gonzalez v. Calderon-Cera*, 398

1   F.3d 1.  The pincite is at 11.

2         THE COURT:  Stop for a moment.  If you cited it, I

3   should have it, and I don't.

4         MR. COOPER:  You know, Your Honor, it may have been an

5   internal cite in a case we cited.  I'm sorry, it's in our

6   supplemental memo, Your Honor.

7         THE COURT:  We can print it.  What's the cite again?

8   My secretary will get it for me.

9         MR. COOPER:  It's 398 F.3d 1, and the statement about

10  ambiguity in the removal statute being construed against

11  jurisdiction is at page 11.

12        THE COURT:  Okay.  Go ahead.

13        MR. COOPER:  The third point, Your Honor, and I think

14  it really has particular application here, is the basic comity

15  concern of deciding substantive Massachusetts defamation law

16  and fair report privilege being left in the hands of a state

17  court judge.  With all respect to the federal court, it really

18  is the application of state law.

19        Your Honor will note from the parties' submissions

20  that, while there may be loose agreement on some of the

21  characterizations of how fairness and accuracy and sting and

22  gist are to be defined, the application of the privilege is all

23  over the place.  And, you know, I will make an argument to you

24  about why, given divergent possibilities at worst here,

25  defendants can't carry their burden on removal, but ultimately

1   it's a state law issue.

2          THE COURT:  Well, except right now we're talking about

3   jurisdiction, not abstention.  Considerations of comity might

4   come into play if you were asking me to abstain under some

5   established doctrine.  But here, either I have jurisdiction or

6   I don't.

7          And I don't think I can properly remand the case

8   because I think the decision should be made by the state court,

9   not by the federal court.  I think if there was sufficient

10  ambiguity and it was important enough, I could certify the

11  question to the SJC, but your statutory point, which I haven't

12  focused on, engages my attention.  I pointed *Breland* out to

13  you.

14         MR. COOPER:  You did, Your Honor.

15         THE COURT:  But the point is, the point is we'll see

16  whether this is material to anything.  If I'm going to remand

17  the case anyway, it doesn't matter whether fraudulent joinder

18  applies to plaintiffs or not.

19         MR. COOPER:  Okay.  I won't repeat Judge Smith's last

20  point, though, about the difference between plaintiffs and

21  defendants.

22         THE COURT:  Well, why don't you repeat it because

23  since I didn't think this was any longer disputed, I haven't

24  refreshed myself fully on it.

25         MR. COOPER:  Okay.  The point that is made in the

1    *Breland Homes* case, Your Honor is that, as here, a defendant

2    has the opportunity to raise a motion to dismiss in the state

3    court action, and the reverse is not true.  So there are

4    practical differences between a plaintiff and a defendant who

5    want to raise a fraudulent joinder issue.

6              THE COURT:  And actually, that's a point that engaged

7    my attention.  I don't know if I flagged it in my order, I

8    probably didn't.  But that's something that led me in my

9    preamble to point out that if the case goes back to the state

10   court and within one year of the filing the complaint in the

11   state court John Wilson Jr.'s defamation claim is dismissed,

12   then the defendants could remove the case again, and it will

13   come back to me.  But that's part of the reason I pointed that

14   out.  There's some force to that.

15             MR. COOPER:  So Your Honor --

16             THE COURT:  Go ahead.

17             MR. COOPER:  That is the argument I would make in

18   terms of the plaintiffs versus defendant removal issue.  And if

19   the Court were to agree with that argument, obviously I would

20   stop there.  However, the next step would be for the Court to

21   consider the issue under the law in *Hack* and *Mills* and

22   *Universal Truck* in this circuit and district as to whether the

23   defendants can establish by clear and convincing evidence that

24   there is no possibility that the highest court in the state of

25   Massachusetts would allow this claim, Johnny's claim, to

1   proceed.

2        And Your Honor, I don't think that -- let me just say

3   in our papers we analogize the standard and we conceded that as

4   a practical matter it probably doesn't work differently than

5   the plausibility standard.  And defendant's picked up on that

6   in the reply saying we've conceded this is basically just a

7   motion to dismiss standard.

8        Well, neither side can have their cake and eat it,

9   too.  In this instance if it's a motion to dismiss standard,

10  and even if it's not, if it is, as the language says in *Hack*

11  and *Mills* and *Universal Truck*, this clear and convincing

12  no-possibility standard, what remains true under either

13  standard is all inferences appropriately pled in the complaint

14  that can reasonably be made must be made in favor of the

15  plaintiff, and in this instance, uniformly across the board,

16  defendants are asking you not just to take inferences in their

17  favor but to resolve factual issues.

18        THE COURT:  Are there remand cases that say the Court

19  is to draw all reasonable inferences in favor of the plaintiff?

20        MR. COOPER:  The remand cases actually say what Your

21  Honor wrote in *Hack*.

22        THE COURT:  Right.  I think that the motion to dismiss

23  plausibility standard and the remand standard are similar but

24  not identical, and I know that a number of cases seem to

25  conflate them and there may be no material difference to them.

1    But I think, for example, I can consider evidence on a motion

2    to remand that I would not be permitted to consider on a motion

3    to dismiss.

4         MR. COOPER:  That is true, Your Honor.

5         THE COURT:  So I'm trying to keep the -- including, if

6    I needed it, opinion evidence you proffer.

7         MR. COOPER:  So, Your Honor, but it becomes important

8    when it comes to an issue like the of and concerning issue.

9    Because what the defendants say is, you know, we plead that the

10   film was understood by a respectable segment of the community,

11   including, and this is important, the audience that was

12   drastically familiar after two and a half years of hearing

13   about the Varsity Blues case with who the players were and who

14   the children were, et cetera, because it must be done in

15   context, and the defendants argue as a matter of law, without

16   offering any evidence, that you just have to rule that no one

17   would have understood it that way.

18        THE COURT:  Well, excuse me.  All right.  I mean,

19   that's --

20        MR. COOPER:  Let me --

21        THE COURT:  That's their argument.  I don't want to

22   get into this now.  I do want to get into this, and maybe you

23   will get to go first.  You're chomping at the bit.  But it

24   doesn't -- I'll hear from Mr. Albano on whether an improperly

25   joined plaintiff can be eliminated for determining whether

1   diversity jurisdiction exists, but I'm going to hear arguments

2   on the merits of the motion to remand.  But Mr. Albano, do you

3   want to be heard?

4          MR. ALBANO:  Yes, please, Your Honor.  There's three

5   points I wanted to make on this issue of the

6   diversity-destroying plaintiff and whether an improperly joined

7   diversity-destroying plaintiff is a basis for removal.

8          The *Breland* case that the plaintiffs are relying on,

9   that Alabama case, that case acknowledges that the majority of

10  courts' decisions that have considered this issue have upheld

11  removals based on a fraudulently improperly joined plaintiff.

12  I would suggest that the *Breland* court did a bit of a

13  disservice to Judge Woodlock's decision in the *Lothrop* case,

14  which we cited.

15         THE COURT:  I have it.

16         MR. ALBANO:  Judge Woodlock's decision in *Lothrop*, the

17  *Breland* court included it in a list of decisions that it said

18  merely assumed, without any substantive analysis, that the

19  doctrine applied to plaintiffs.

20         The reason I think that's a bit of a disservice is

21  because what Judge Woodlock said in *Lothrop* is that he

22  acknowledged that the doctrine is often applied in cases in

23  which plaintiffs are trying to defeat removal by adding a

24  nondiverse defendant, but he went on to say that courts have

25  found that the doctrine can be applied to the alleged

1    fraudulent joinder of a plaintiff, citing the *Kansas State*
2    *University* case, which in turn, as he noted in his decision,
3    collects cases on the subject.  So that's the first point I
4    wanted to make, that even *Breland Homes* agrees that it's the
5    majority.
6          The second thing I would add to this is that there's a
7    case we cited in our jurisdictional brief, and in the last
8    brief, it's a Supreme Court case, *Ruhrgas v. Marathon Oil*, it
9    is 526 U.S. 574.
10         THE COURT:  Hold on a second.  I should have that,
11   too.
12         How do you spell the first name?
13         MR. ALBANO:  R-u-h-r-g-a-s.
14         THE COURT:  Hold on a second.
15         MR. ALBANO:  *Ruhrgas v. Marathon Oil*.
16         THE COURT:  For some reason that's not printed either.
17   What did you say it was, 526 U.S. 574?
18         MR. ALBANO:  That's correct.
19         THE COURT:  My secretary should bring me that one,
20   too.
21         MR. ALBANO:  What I thought was not just interesting
22   but persuasive about the Supreme Court's analysis in this case
23   is this is a case where a defendant removed a case to federal
24   court alleging that the diversity-destroying plaintiff had been
25   improperly joined to the case, and they had two other removal

1  arguments that they made.

2          The case works its way up to the Supreme Court.  The

3  Supreme Court did not blink at the notion that that was one of

4  the grounds asserted for removal.  It said, in fact, it said if

5  the joinder of the plaintiff is legitimate, the complete

6  diversity required by section 1332 is absent.  Then, and this

7  is what I think is compelling about the case, the Court went on

8  to address some other removal arguments that the plaintiff had

9  made, including one under an international arbitration statute.

10  And it said that issue, not the fraudulently joined plaintiff

11  but the international arbitration removal, there we find a

12  difficult issue of first impression.

13          And so facing these federalism issues it says because

14  that other removal ground is a difficult issue, the trial court

15  was correct to not address subject matter jurisdiction, despite

16  that being the general rule, and instead dismissed the case on

17  personal jurisdiction grounds.  And it just seems reasonable to

18  conclude that if the Supreme Court is making a decision that

19  says, Here is why the trial court did not need to address

20  subject matter jurisdiction, there is a novel issue of subject

21  matter jurisdiction, the court can pass on that.

22          You would think that if the fraudulently joined

23  plaintiff was also a controversial issue, that given the stakes

24  in the case, that would have been noted by the Supreme Court as

25  opposed to just saying if the plaintiff was properly joined,

1    there's no diversity.

2         THE COURT:  What page are you citing for this

3    discussion?

4         MR. ALBANO:  International Arbitration argument, that

5    is 9 U.S.C. Section 205, and that discussion where they say

6    it's a difficult issue of first impression is at page 582.  And

7    the spot where -- give me one moment, Your Honor.  Page 584,

8    yes, 584 is where they say if the joinder of Norge, that's the

9    diversity-destroying plaintiff, is legitimate, the complete

10   diversity required by statutory cite but not by Article III is

11   absent.

12        THE COURT:  Hold on just a second.  Let me find that.

13   Okay.  Well, I raise the issue --

14        MR. COOPER:  May I respond?

15        MR. ALBANO:  There were three things I wanted to say.

16        THE COURT:  Okay.  Go ahead.

17        MR. ALBANO:  These minority, the minority cases that

18   reject the doctrine as applied to plaintiffs, they don't offer

19   a response to the logical argument, and I mean that in quotes,

20   "the logical argument" that the majority of cases apply.

21        The most they say, and *Breland Homes* does this, too,

22   is the defendant can move to dismiss, go down to state court.

23   If you have your day there and it gets dismissed in time,

24   you'll be able to remove.  I would say that's not much

25   different in kind than saying in any removed case, Don't worry,

1    things might work out fine for you in state court.

2         In that *Marathon Oil* case the Court said federalism

3    doesn't mean blind deference to state rights, and the concept

4    means there's a system of sensitivity to both.  And our

5    position is that that sensitivity should afford equal access to

6    federal courts where any diversity-destroying party is added,

7    either plaintiff or defendant.

8         THE COURT:  All right.

9         MR. ALBANO:  That's my pitch.

10        THE COURT:  Mr. Cooper, do you want to briefly

11   respond?

12        MR. COOPER:  I don't think I need to, Your Honor,

13   other than to say that I don't see any decision that actually

14   considers the plain language of 1441(b), and I would suggest,

15   respectfully, if we're going to make assumptions about what

16   judges were or courts were and were not thinking, it's that

17   these issues have not been squarely raised, and they were in

18   the *Breland Homes* case.  And I will leave it there, Your Honor.

19        MR. ALBANO:  Your Honor, since it hadn't been raised

20   before, the fictitious defendants, I haven't researched that,

21   but I'm thinking that is talking about John Doe defendants, and

22   it's not surprising that if you name a John Doe defendant, it

23   might have that effect, but I haven't researched it.

24        THE COURT:  What section of 1441 are you citing,

25   Mr. Cooper?

1          MR. COOPER:  It's 1441(b)(1).

2          THE COURT:  I'm sorry, (b)(1).  I think there may be a

3    good reason why nobody's analyzed this.  It looks to me like

4    Mr. Albano is probably right.  John Wilson Jr. is not sued

5    under a fictitious name.  That's his name.  All right.

6          MR. COOPER:  My point there, Your Honor, was simply

7    that it refers solely to a concern about defendants, not

8    plaintiffs.

9          THE COURT:  Well, plaintiff, unless allowed to proceed

10   John Doe to protect privacy, would know his own name.

11         MR. COOPER:  -- own name and add John Does 1 through 3

12   and allege that they had some address that defeated diversity.

13   Purely hypothetical, Your Honor, but the language is there.

14         THE COURT:  So I had thought that the defendant with

15   the burden of proof would go first, but maybe I'll have

16   Mr. Cooper go first.

17         But the standards as I stated in *Hack* for remand and

18   to prove fraudulent joinder, the defendant must present clear

19   and convincing evidence that there's no reasonable possibility

20   that John Wilson Jr. has or can stay a cause of action against

21   the defendants in state court that essentially wouldn't survive

22   a motion to dismiss.

23         So this means, to defeat remand, I'd have to be

24   persuaded there's no reasonable possibility that the Supreme

25   Judicial Court would find that Johnny Wilson stated a claim for

1    defamation.

2          I'll tell you the following, but you're more versed in

3    this than me.  My tentative view is that the *Hack* standard is

4    not met.  And this is tentative.  You've already further

5    educated me, and I want to hear from both of you.

6          First I have a question as to whether the film may not

7    be a report of an official proceeding.  This is maybe not

8    something you fully considered, and I'm not deciding the case

9    based on something you haven't considered or had a chance to

10   make informed argument of, but I think it does fit within other

11   arguments.

12         It re-enacts and dramatizes events, and there's a lot

13   of commentary interspersed, and it, among other things,

14   re-enacts wire-tapped tape-recorded conversations.  And I

15   thought that the strongest point, my tentative thought is the

16   strongest point that the plaintiff Johnny Wilson has comes up

17   right at the beginning in that from about two minutes to five

18   minutes where there's a re-enacted version of a taped

19   conversation between his father and Singer at the same time the

20   creation of a water polo player is being photoshopped, and

21   there's a possibility, if I had to, I might say more than a

22   possibility, that somebody watching it would think that that's

23   a picture of Johnny being created, somebody who was never a

24   water polo player.  It's alleged and there's evidence that he

25   was an accomplished water polo player, although maybe not one

1    who could play more than one semester for USC.

2         Then I suppose the question would be, well, does that

3    make any difference, you know, is the gist of it the same.  But

4    at the moment I doubt that there's no reasonable possibility

5    that the gist would be found different.

6         MR. COOPER:  If Your Honor asks --

7         THE COURT:  Here, I'm just giving you my tentative

8    thoughts.  You'll get a chance to address this.

9         MR. COOPER:  My screen is a little jittery.  I thought

10   you were done.  My apologies.

11        THE COURT:  No.  I paused.  Is there no reasonable

12   possibility that his classmates and others would look at him

13   differently, think less of him if he was no water polo player

14   at all.

15        Anyway.  Then at about 35 minutes, there's a

16   journalist who is talking about the five-foot-six-inch student

17   who was represented to be six-one and a basketball player and a

18   cheerleader who was represented as being a lacrosse player and

19   somebody who never played water polo who was represented to be

20   a water polo player, and then it has a resume or maybe it's

21   called a profile on the screen.  And from the little I could

22   discern, it looked like that one might regard that as Johnny

23   Wilson's resume.  So again, the photoshop, you know, sending

24   the message that he wasn't a real water polo player, not that

25   he was a water polo player who his father paid a lot of money

1    to get into USC.

2          Then I don't know to what extent, if any, this is

3    relevant to the analysis of Johnny Wilson's claims, but John

4    Wilson, I think the only time that the film communicates that

5    John Wilson, the father, pled not guilty and hasn't been

6    convicted is at the end where there are pictures of many

7    defendants, and after about seven are said to have pled guilty,

8    there's a picture of him -- well, there's a statement that he

9    pled not guilty.  I think that comes right after the short

10   video of the fictional John Wilson Sr. being arrested, but

11   maybe that's not what that is.

12         But there's a case I think you didn't -- well, I know

13   you didn't cite.  *Cianci,* it's a Second Circuit case, 639 F.2d

14   54, and there are other cases that cite this or follow it.  But

15   it says on page 68, this is talking about the neutral reportage

16   privilege, but it's similar.  It says, "It's clear however that

17   a publisher who in fact espouses or concurs in the charges made

18   by others or deliberately distorts these statements to launch a

19   personal attack of his own on a public figure cannot rely on

20   the neutral reportage privilege."

21         So the question is whether this film, it may be proven

22   that this film doesn't just report on what happened in the

23   so-called Varsity Blues case but espouses the validity of the

24   charges against John Wilson Jr. in a way that damages his son,

25   defames his son as well.  And these are all variations of the

theme.  Is it a fair abridgement or are there elaborations and

innuendos that make it unfair?

So now finally, Mr. Albano, since Mr. Cooper has the

motion to remand and thought he would go first, should I hear

from him and then you?

MR. ALBANO:  Up to you, Your Honor.  I'm happy to go

now or respond to his argument.

THE COURT:  All right.  Here, I'll let Mr. Cooper go

first so he doesn't jump out of his seat.

MR. COOPER:  Thank you, Your Honor.  I appreciate it.

You know me too well at this point.

Let me start by picking up on Your Honor's comments

and your question about whether this was just a film which was

a report of an official proceeding.  Clearly it was not.

There were, to go back to a word you used earlier in

our hearing, Your Honor, very material additions to whatever

was on the public record.  I'm not going to give you a laundry

list here, Your Honor, but in addition to some of the things

that you pointed out, there are commentators, a Donna Heimel at

37 minutes 45 seconds saying this was about fake athletes at

USC.  Your Honor had the one at 35 minutes about the water polo

that didn't play water polo in high school.  The term "fake

athletes" is repeated at 35:09.  At 45:50, a commentator is

brought on to say that the scandal was about bribing college

coaches to pretend kids were athletes when they were not, and

1    it goes on.

2         And, Your Honor, it isn't just the libel that Johnny

3    Wilson -- I'm just going to refer to him as "Johnny" -- was a

4    fake athlete, which is a statement of fact because it's capable

5    of being proven true or not true, especially in this context,

6    but whether he was a fake athlete as a result of which his

7    father had to engage in deception through photoshopping, a fake

8    resume and paying a bribe to get him on to the USC water polo

9    team.  None of which is true.

10        THE COURT:  Well, how do you know it's not true?  I

11   don't know whether it's a bribe or not a bribe, but his father

12   paid -- apparently it's undisputed, his father paid $500,000

13   that he thought was going to USC, and then his son who was not

14   a recruited athlete was admitted.

15        MR. COOPER:  You don't have to resolve the issue of --

16        THE COURT:  That's what I thought.

17        MR. COOPER:  -- whether or not it's true, Your Honor.

18   What you can take notice of, though, and this is very important

19   in terms of a fair and accurate report on what's on the public

20   record in the Varsity Blues prosecution, attached as Exhibit E

21   to the defendant's motion is a brief that was filed by

22   Mr. Wilson's counsel in his criminal case before Judge Gorton.

23   It's a motion to sever and in the alternative to dismiss.

24        THE COURT:  Let me get it for just a second.  Let me

25   get it.  These are the exhibits to --

1          MR. COOPER:  This is one exhibit to the one-page

2     motion to dismiss.

3          THE COURT:  Hold on a second.  You want me to look at

4     which exhibit, L?

5          MR. COOPER:  It's Exhibit E, Your Honor.  You actually

6     have this in multiple places.  I was referring to the

7     defendant's submission because --

8          THE COURT:  I have it.

9          MR. COOPER:  -- it was part of the official report and

10    I would note that this is one of the documents that the

11    prepublication warning letter that was sent to Netflix by my

12    office directed the defendants to with the docket number

13    attached or referenced.

14          And Your Honor, I'm only going to look at one example

15    that happens to be on the first page, second paragraph.  It is

16    in the official record of the proceeding that, quote, "Wilson's

17    son was a star high school athlete who became a contributing

18    member of USC's renowned water polo team, that he had earned

19    grades and scores that met USC's admissions standards.

20          Now, Your Honor, this issue goes to the fair report

21    issue, and I do think that there is some agreement on the

22    broader concepts of the fair report privilege under

23    Massachusetts law, but let me just restate them.

24          In order for a defendant to avail itself of whether

25    they want to call it a fair abridgement or rough and ready

1     abridgement or summary, et cetera, the report must be fair, and

2     it must be accurate.  Fairness and accuracy in terms of not

3     creating a misleading impression of the events that took place

4     or the character of the events that took place, and the real

5     value being protected here is whether the inclusion of

6     additional information, the editing, the exclusion and omission

7     of information created a sting, a gist, that the gist of the

8     article or of the piece created a sting that was worse than

9     what the truth would have created.

10          And in this instance, from Johnny's perspective, Your

11    Honor, being held up as, what he says, contrary to the truth,

12    as a fake athlete without equal disclosure of what was

13    available in that official record, that it was defendant's

14    position and it was in the record that he was in the olympic

15    development program; he was in a top high school program; that

16    his coach had spoken to the coach at USC; that he actually went

17    to the school and made the team and was on the team for a

18    semester; and that he was a real water polo player, without the

19    inclusion of the notes that Mr. Singer made, contemporaneous

20    with the events charged in the indictment, that when it came to

21    Johnny, the matter involved the application of a real water

22    polo player in the record.

23          THE COURT:  Why is the gist or sting materially

24    different?  The overall gist is that John Wilson Sr. paid

25    $500,000 that he thought was going to USC to assure that his

1    son get in as a water polo player for the water polo team.  And
2    I think that the film can be construed, could possibly be
3    construed as communicating that he wasn't a water polo player
4    at all, that he was photoshopped.  But why is there a material
5    difference between those two things?
6         MR. COOPER:  There's a material difference, Your
7    Honor, between Johnny being associated with an allegation
8    against his father that his father perpetrated a fraud, whether
9    true or untrue, and an allegation targeted directly at Johnny
10   both directly and through innuendo and juxtaposition of
11   photographs with the conversation, et cetera, the sting of
12   which is that Johnny is a fraud; that Johnny was not a real
13   athlete; that he couldn't play water polo; he couldn't have
14   made the team on his own.  And in fact he was treated as a
15   walk-on recruit who made the team, who practiced with the team
16   for an entire semester.  And as I understand it, Your Honor,
17   that was a pretty tremendous commitment that that young man
18   actually made and went through.
19        And more importantly, he is juxtaposed in this film
20   next to very high profile and famous people, like Lori Loughlin
21   and Mossimo Giannuli's daughter Olivia, whose body was put on a
22   rowing machine, other people whose faces were photoshopped on
23   athletes.  And I would submit to you, Your Honor, that in the
24   first instance, this case is on all fours with the *Schiavone*
25   case from the Third Circuit, a 1988 case.

```
 1              THE COURT:  Written by my late and much missed friend
 2     Judge Becker.  Go ahead.
 3              MR. COOPER:  Well, I think Judge Becker got it just
 4     right when he said, you know, okay, it may be that an FBI
 5     302 --
 6              THE COURT:  Hold on a second.  Let me get the case,
 7     please.  What page are you on?
 8              MR. COOPER:  I do not have the pincite to that, Your
 9     Honor.
10              THE COURT:  Go ahead, tell me.
11              MR. COOPER:  So Judge Becker was faced with a
12     situation where there was an FBI 302 reported on in the media
13     talking about individuals in the context of the investigation
14     of the murder of Jimmy Hoffa and his disappearance.
15              And a lawsuit was brought, and I'm going to grossly
16     oversimplify it, but by someone whose name appears in the memo
17     but as to whom there was a sentence that the agent that
18     prepared the memo said these associations do not mean that
19     there was criminal activity.  And the newspaper reported on the
20     memo and left that qualifier out, and the court ruled that
21     there was no protection of the fair report privilege and there
22     couldn't be because, by virtue of omission, the report had a
23     different sting, and it was neither fair nor accurate to the
24     extent it created a misleading impression of the facts and the
25     character of the events.
```

1          Similarly, Your Honor, there is the very recently

2     decided case of *Alan Dershowitz v. CNN*.

3          THE COURT:  Yes, I pulled that one out, too.  Hold on

4     a second.  Go ahead.

5          MR. COOPER:  In that case, Your Honor, despite the

6     really global audience watching the impeachment proceedings and

7     having access to all of them, CNN published a story and spent

8     some time on it with the message of the story being that Alan

9     Dershowitz had stood in the lobby of the Senate and advocated

10    that President Trump was immune and any type of decision that

11    he made enjoyed immunity.

12         And in publishing it, they neglected to include the

13    preamble that Professor Dershowitz had given to what he was

14    arguing, which made it perfectly clear that he was arguing

15    something far more limited than what was said.  And Professor

16    Dershowitz became the object of ridicule and scorn as a result

17    of that false report.

18         Here, we have the government's side of the story in

19    the film.  It's embellished and added to through commentators

20    in some of the statements that I gave you and that Your Honor

21    identified, but we also have the omission of the other side of

22    the story.  And you cannot be making a fair and accurate report

23    of an official proceeding that has not gone to trial yet, no

24    one's been found guilty or acquitted, without reporting on both

25    sides of the issue that are available in that public record.

1          And I would say again, Your Honor, Netflix didn't have

2     to go hunting for this.  Prepublication we wrote them a letter,

3     gave them the pleadings, including the one I mentioned, and the

4     docket numbers as to where they were found and said, "If you

5     are going to do a fair and accurate report, you must include

6     this."  And they decided not to.

7          And it is for that reason, Your Honor, that I called

8     out to you earlier comment F of the Restatement Second of Torts

9     at 611, and with the Court's permission, I'd just like to give

10    you a little bit more of it.  This is the Restatement cited in

11    not just the *Howell* case but frankly in many of the cases --

12         THE COURT:  It's in *Schiavone*.

13         MR. COOPER:  It is.  It says, "Not only" --

14         THE COURT:  Here, stop.  Don't go too fast for the

15    stenographer.

16         MR. COOPER:  Sure.  "Even a report that is accurate so

17    far as it goes may be so edited and deleted as to misrepresent

18    the proceeding and thus be misleading.  Thus, although it is

19    not" -- excuse me -- "although it is unnecessary that the

20    report be exhaustive and complete, it is necessary that nothing

21    be omitted or misplaced in such a manner as to convey an

22    erroneous impression to those who hear or read it, as for

23    example, a report of discredible testimony in a judicial

24    proceeding and a failure to publish the exculpatory evidence."

25    Then it goes on several more sentences, Your Honor.

1          Now, what happened here, Your Honor, is, as I said, a

2     decision was made, we allege by Netflix, to publish a film

3     reporting on evidence, namely reported communications, and we

4     don't contest with regard to Johnny that the reported

5     communications are incorrect but to not publish the other side

6     of the story --

7          THE COURT:  Stop for just one second.

8          MR. COOPER:  Yes.

9          THE COURT:  So the second paragraph of F says, "Not

10    only must the report be accurate, but it must be fair.  Even a

11    report that is accurate, so far as it goes, may be so edited

12    and deleted as to misrepresent the proceeding and thus be

13    misleading.  Thus, although it is unnecessary that the report

14    be exhaustive and complete, it is necessary that nothing be

15    omitted or misplaced in such a manner as to convey an erroneous

16    impression to those who hear or read it.  As for example a

17    report of the discredible testimony in a judicial proceeding

18    and a failure to publish exculpatory evidence."  Then it goes

19    on.

20         So here it's saying in some circumstances a failure to

21    publish exculpatory evidence can mean the statement is not

22    privileged, right?

23         MR. COOPER:  Yes, Your Honor.  And our argument is

24    that that is what happened here.  I understand that the

25    defendants will want to argue a divergent view, but there is

```
1    law out there that says as much as a fair question presents a
2    question of law for the Court, that where the Court finds a
3    divergent view, it's a jury issue.
4         THE COURT:  And this is an issue on remand.  I would
5    have to find by clear and convincing evidence that it's not
6    possible that you're right.
7         MR. COOPER:  Correct, Your Honor, correct.  And Your
8    Honor, I would add in this regard, and I know Your Honor
9    appreciates this based on your earlier comments, but this is
10   not a -- this film has to be understood in context.  This was
11   not a single publication in terms of, you know, this is a
12   documentary someone put together out of the blue.
13        This film was published by Netflix in the midst not
14   just of a pandemic but two and a half years of Varsity Blues
15   stories.  So it's not a matter of what would, you know, some
16   uninformed audience think, but rather there is a respectable
17   segment of the community out there, and it really need not even
18   be more than one person.
19        And for that proposition I want to cite, Your Honor,
20   to a case that we didn't include in our brief.  It's *Doe v.*
21   *Sammy Hagar*, and we can get your clerks the cite, from the
22   Sixth Circuit where Sammy Hagar, the rock star, wrote a
23   biography, an autobiography.  And in it he claimed that he had
24   been extorted by a Playboy bunny who he didn't name who faked a
25   pregnancy in order to get money from him.
```

1          And defendants moved to dismiss based on the idea, the

2     argument that she wasn't named and no one would know who this

3     person was.  And affidavits were submitted in that case from a

4     half dozen people who had traveled around with whatever band

5     Mr. Hagar in at the time, and I should probably remember that

6     but I don't, who said, Oh, no, when we read the book, when we

7     read Sammy's book, we knew exactly who he was referring to, the

8     Playboy bunny, and they knew her.

9          And the District Court dismissed that case.  The Sixth

10    Circuit reversed it saying, No, no, no, you have to consider

11    the audience, including the audience that's important to the

12    plaintiff.  And here, as Your Honor said, acquaintances, other

13    students, co-workers, people who have been following the

14    Varsity Blues case, they would know exactly who Johnny Wilson

15    Jr. was.  They would know that he was one of Mr. Wilson's

16    children as to whose college admissions Mr. Wilson had been

17    indicted.

18          THE COURT:  But he's identified by name, Johnny, in

19    the film, isn't he?

20          MR. COOPER:  His father is identified by name.  They

21    share the same name, Your Honor.  John Wilson.

22          So Your Honor, that leads me into the of and

23    concerning issue, which is the second issue, and I've been very

24    brief about that.  Massachusetts law is clear that an allegedly

25    defamatory piece need not name or specifically identify the

1    target of the defamatory publication.

2         The *Eyal* case concerning Haim's Deli, in which the

3    owner of the deli was not named but it was reported that the

4    owner of the deli in Brookline was part of an international

5    cocaine ring, the Court said everyone knew who that was.

6    Anyone that went to that deli knew who that was.

7         And just as is the case there -- well, I'll go on,

8    Your Honor.  The of and concerning can also be established via

9    juxtaposition.  For example, and I know that Mr. Albano who

10   I've discussed this case with does not like it or agree with

11   it, but I will call to the Court's attention *Stanton* --

12         MR. ALBANO:  I love that case.

13         THE COURT:  Go ahead, go ahead.

14         MR. COOPER:  -- the *Stanton v. Metro* case, Your Honor,

15   in which the Metro newspaper, which you would see handed out

16   around Boston for free, published a story about promiscuous

17   teenage girls and included on the front page a photograph of a

18   group of girls who had no connection to the story at all and

19   saved until towards the end of the story a disclaimer that the

20   girls were not the girls in the photograph.

21         And the First Circuit -- again, I'm oversimplifying

22   here, Your Honor -- held that first you can't assume that

23   people are going to read beyond the headline in the first

24   paragraph.  And secondly, the juxtaposition of that photo to

25   the headline and the opening language made it clear that a

1    reasonable reader could infer.  And, you know, the Court made

2    clear that there is both a subjective way and an objective way

3    for the plaintiff to become someone as to whom the story is of

4    and concerning.

5           And we plead both.  We plead that they intentionally

6    spoke in this film and made it a centerpiece of the film to

7    talk about John Wilson who had pled not guilty in the context

8    of five other parents who go before and after him, all of whom

9    had pled guilty, and to talk about water polo players who were

10   fake and putting shots up on the screen.  And that is

11   indistinguishable from the *Stanton v. Metro* case, Your Honor.

12          There are other cases.  We've cited them in our brief.

13   Juxtaposition cases, I would encourage Your Honor to look at

14   Judge Tauro's decision from *Brown v. Hearst.*  That goes back a

15   ways.  There's a *Crane v. Arizona Republic* case, literally, the

16   juxtaposition of two people denying allegations where one of

17   them was guilty, had been proven guilty already to suggest that

18   the one that was denying was also somehow guilty.

19          THE COURT:  What case is that?

20          MR. COOPER:  That's *Crane v. Arizona Republic*.  I

21   believe it applies to substantive defamation law of Arizona,

22   Your Honor.

23          So with regard to Johnny, what is his claim?  His

24   claim is that in context, the totality of this film makes it

25   appear to a reasonable reader -- excuse me -- reasonable viewer

1    at home watching too much Netflix probably during the course of

2    the pandemic, that his father paid for him to get into USC as a

3    water polo player when he was a fake water polo player and not

4    an athlete.

5         THE COURT:  I don't think that's the best iteration of

6    your argument for these purposes.  His father did --

7         MR. COOPER:  Well, if I did a better job earlier, Your

8    Honor, I'll stick with what I said earlier.

9         THE COURT:  I think you said the same thing earlier.

10   His father made a payment that was intended to get him into USC

11   and to have him presented by a representative of the water polo

12   team, the coach, as somebody the coach wanted, and the coach

13   was getting money.

14        MR. COOPER:  Your Honor, that's not what the

15   allegation is, and it's an important distinction.  The

16   allegation against Mr. Wilson is the so-called side door

17   allegation.  The government doesn't even allege that Johnny was

18   a photoshopped fake athlete.

19        THE COURT:  There's lots of athletes, probably lots of

20   water polo players, and only a fraction of them are recruited

21   by a particular school, and maybe he would have got in anyway.

22   But I think your point is, as I understood it from your papers,

23   is, even if his father made a payment, there's a material

24   difference between saying, you know, like many of the others,

25   he wasn't any athlete at all and writing something or putting

1    something in a film that makes him look like he was one of the

2    people who was photoshopped because he was not an athlete where

3    actually he was a competitive water polo player and maybe he

4    would have got in anyway.

5            MR. COOPER:  I'll go with Your Honor's --

6            THE COURT:  But then it comes back to the question,

7    you know, is there a possibility that that changes the gist of

8    things.  At the moment, I think there is.

9            MR. COOPER:  And Your Honor, this is my last point.

10   That is, again, the focus of the fairness and accuracy and the

11   issue of the sting is whether it would have been materially

12   different to the target of the defamation.  And I can tell you

13   just as sure as the sun is shining today, and I'm looking out

14   the window, that to Johnny, this was night and day.  What they

15   did to him was reputation-ruining, and it was materially

16   different.

17           The defendants want to argue, well, fraud is fraud.

18   It is materially different to be the son of a parent charged

19   with a crime involving fraud and to be someone who had to, by

20   virtue of knowing they were a fake athlete, be somehow

21   complicit to that.

22           THE COURT:  You say this is to be viewed from the

23   perspective of the plaintiff here, Johnny.  What's the

24   authority for that?

25           MR. COOPER:  Well, the authority for that, Your Honor,

1      is *Howell* first and foremost and the Restatement.  But Your

2      Honor, I think that the more accurate way to say what I said is

3      not Johnny's subjective state of mind but rather what,

4      objectively speaking, a reasonable viewer would have thought of

5      Johnny.

6                  THE COURT:  Well, that's --

7                  MR. COOPER:  I think that's the more accurate way to

8      state it, Your Honor.  But at the end of the day, we are

9      talking about the different impact on the target's reputation.

10     And I will stop there, Your Honor, unless you have any

11     questions, and I very much appreciate you and Mr. Albano

12     letting me talk first.

13                 THE COURT:  Okay.  Mr. Albano.

14                 MR. ALBANO:  Thank you, Your Honor.  One thing I'd

15     like to make sure I accomplish or try to accomplish today is to

16     distinguish between the law of fair report and general

17     defamation law.

18                 For example, if I stand out on the street and say that

19     John Wilson bribed someone, I am responsible.  Even if I heard

20     it from someone else, I am responsible for it.  The basis for

21     the fair report privilege is this exception to the longstanding

22     common law rule that the republisher of a statement is equally

23     liable.  Even if I say, "I heard Howard Cooper say X today" and

24     I accurately quote Howard, I'm vouching for the truth of

25     Howard's statement.  Not so in the fair report context.  There

1    is no requirement that the statements be true.

2          So for example, in paragraph 27 of the complaint, when

3    the plaintiffs allege that -- I'll just paraphrase, but this is

4    a close paraphrase.  The defendants ignored public records,

5    public court records that made clear that Mr. Wilson was an

6    innocent man who had been falsely accused.  Well, leave to one

7    side the fact that if the Court records made it clear that he

8    was an innocent man, why is there going to be a trial?  That's

9    not the point I'm trying to make.

10         The point I'm trying to make is, if you accurately

11   report the government's charges, you are protected by the fair

12   report privilege.

13         THE COURT:  In every circumstance?

14         MR. ALBANO:  If it's clear -- yeah, it has to be a

15   fair report, and I would like to get to what the actual

16   requirements of a fair report are.

17         THE COURT:  Okay.

18         MR. ALBANO:  It's got to be safe to say that everyone

19   here agrees that the film could have described the case in the

20   same way the plaintiffs described it in their first brief when

21   they said that John Jr.'s admission to USC is, quote, "at the

22   center of the charges against Wilson," close quote.  And that

23   Mr. Wilson is charged with, quote, "conspiring with Singer to

24   bribe Johnny's way into the University of Southern California

25   by making a contribution to the polo program in exchange for

1    the coach designating him as a walk-on candidate which gave him

2    favorable admissions treatment."  That's the government's case.

3          Now, they may be wrong.  Mr. Wilson is entitled to

4    fight that charge and say it's false and he's innocent.

5    Different question about whether under the fair report

6    privilege, once the government says it, we can repeat it.

7          THE COURT:  And I expect you'll get to it, but it

8    seems to me that it's possible that John Wilson Sr. doesn't

9    have -- he may not have a meritorious defamation claim.

10   Netflix might have a privilege with regard to his claim.  I

11   haven't thought this all the way through, but here, the

12   question is John Wilson Jr.

13         MR. ALBANO:  Correct.

14         THE COURT:  And what's in the record -- one thing you

15   cited was something Judge Gorton wrote, but what's in the

16   record of the criminal case about John Wilson Jr. that makes

17   the film in your view a reasonable summary, not an unfair

18   abridgement?

19         MR. ALBANO:  Okay.  Starting point is, we all agree

20   the case, what they say is the heart of the case is Mr. Wilson

21   paying a bribe to get his son in as a walk-on recruit.  The

22   superseding indictment repeatedly refers to John Jr.'s

23   admission as a purported water polo recruit.  As you noted,

24   Judge Gorton in reciting the facts of the case --

25         THE COURT:  Here, let's slow down just a minute,

1     please.  There are a couple of places where I have a fourth

2     superseding indictment.  I have 7-6, which is an excerpt of it,

3     and then 20-2, which is the whole thing.  So looking at 7-6,

4     the allegations regarding John Wilson Sr. begin at paragraph

5     225.

6          MR. ALBANO:  So 227, "to secure his son's admission as

7     a purported water polo recruit."  225 has the same language,

8     "purported water polo recruit."  I believe 281 does.

9          THE COURT:  But see, this goes again to my question.

10    It goes to the gist or the sting.  Is there a difference

11    between somebody saying that somebody wasn't honestly

12    recruited -- well, somebody wasn't recruited to play water polo

13    and saying, even though he was a competitive water polo player

14    and had been in olympic development programs, he's not a water

15    polo player at all.

16         MR. ALBANO:  Let me address that, Your Honor, because

17    there's probably four separate parts of the record, short parts

18    of the criminal record that I think address that.  You already

19    mentioned Judge Gorton's statement that Wilson's son played

20    high school water polo but was not qualified to play on the

21    varsity water polo team at USC.  So we know the defendants

22    could safely publish that.

23         There also is, as Judge Gorton said, in executing the

24    plan, Singer embellished the athletic profile of Wilson's son

25    to include fabricated awards.  John Jr.'s high school water

1   polo coach confirmed that the profile contained

2   misrepresentations of his athletic accomplishments.  And you

3   can see that at Exhibit I to the motion to dismiss.  There's an

4   interview.  It says things like he was a B plus player, USC

5   recruits A and A plus players, and then he goes on to talk

6   about the awards on the profile that he had not in fact

7   obtained.

8           There are other court records involving the separate

9   indictment of the coach, Coach Vavic, who is charged with

10  accepting a bribe to admit John Jr. to the water polo team.

11  Those allegations are that Vavic falsified water polo

12  credentials for John Jr., that Mr. Wilson had previously

13  acknowledged to Singer that his son's skill level would

14  obviously be below that of the other freshman, and he

15  questioned whether his son may be so weak as to be a clear

16  misfit at practice.

17          THE COURT:  But in my still tentative current

18  conception, if the film merely created the impression that

19  Johnny wasn't recruited by USC and his father paid $500,000 and

20  he got in, that would be accurate.  But if the film reasonably,

21  could possibly reasonably be interpreted as saying not only was

22  he not recruited but he's not an athlete at all, he got in

23  because his face was photoshopped onto the body of a real

24  player, that would not be accurate.  And then the question is

25  whether that could be found to have a different gist or sting,

1    and my current conception is it could.

2         I mean, the kid was good enough to play on or get

3    invited to an olympic development program.  He's going to take

4    pride in his athletic ability.  And if people look at you and

5    say, Well, you weren't good enough to play for the best water

6    polo team in the country, that's one thing.  And if somebody

7    looks at you and says, You're not a water polo player at all, I

8    think subjectively that could reasonably be found to sting.

9    And, I don't know, if you've been a father of an athlete, you

10   might understand it.

11        Anyway.  Go ahead.  And there is the whole gestalt.  I

12   mean, the movie starts, and at some point you'll have to

13   address whether this really is covered by the -- you know, is

14   this a report on official proceedings or is this done for

15   entertainment and for commentary.  Because the end of it sort

16   of, it talks about the great disparities of wealth in the

17   country.  But this is from Johnny's perspective.  I'm not

18   focused on whether there's a reasonable possibility that John

19   Wilson Sr. will prove he's been defamed but whether his son --

20        MR. ALBANO:  So I think the theory under a fair report

21   argument of the plaintiff would have to be that it was fine for

22   you to report that my father was charged with bribing my way

23   onto the water polo team; it was fine for you to report that

24   the judge said I was not qualified to play on the team; it was

25   fine for you to report that my athletic profile included

1     falsified water polo credentials that the government said was

2     in part of the basis for my admission to USC.  You could have

3     said all of that, but only if you also said I was a pretty good

4     water polo player in high school.

5            That's why -- and for example, to go back to Exhibit

6     I, what's actually in the record, there's another thing his

7     coach said.  "Junior Olympics is a club team tournament hosted

8     by USA Water Polo.  Everyone plays in the tournament.  It is

9     easy to qualify."

10           If one compares the gist, and it's not -- I

11    understand, and I think we all do, that the individual

12    plaintiffs have understandably strong feelings about the film.

13    But that's not the test here.  The test is what would a

14    reasonable viewer conclude.

15           THE COURT:  The test is could a reasonable viewer

16    possibly agree with the plaintiff.  And you have to present

17    clear and convincing evidence that the answer is no.  And I

18    think Mr. Cooper, if I would have let him, and I wouldn't,

19    would jump in and say you didn't fairly characterize the

20    argument with regard to John Wilson Sr. because it's not fairly

21    reported that he pled not guilty and he's going to trial.  And,

22    you know, the gestalt of the film is that, it's espousing, it's

23    asserting that he's guilty with all the rest that he's lumped

24    in with.

25           Is there anybody else in the film who is going to

1    trial who didn't plead guilty?  I don't remember from looking

2    at the ending.

3         MR. ALBANO:  I know there were other not-guilties.  I

4    forget the number pleading not guilty.

5         THE COURT:  But I think there's a reasonable

6    possibility that watching the film people would think he's

7    guilty, and one of the things he did is photoshop his son.

8         MR. ALBANO:  Right, if I may address that.  First of

9    all, one of my starting points is Judge Keeton's language in

10   the *Ricci* case.  Although the public may not fully understand

11   the presumption of innocence in criminal proceedings, no doubt

12   they understand that there is a difference between a charge and

13   a conviction.

14        And in that case, it was reported that the plaintiff

15   -- that there had been a mistrial because the plaintiff had

16   threatened either a juror or witness, a complete omission of

17   the fact that the defendant denied doing that and a complete

18   omission of the fact that the judge, the trial judge never

19   ruled on it.

20        THE COURT:  Let me ask you this.  Does it make any

21   difference for present purposes that Judge Keeton decided that

22   on summary judgment?

23        MR. ALBANO:  No, no, Your Honor, because the fair

24   report analysis is simply what do the court records say and

25   what did the publication say.  And in terms of what the SJC

1   would say, can there be a better -- I think there is a pretty

2   good indication, and that's an understatement.  We have the

3   Superior Court decision of the late Chief Justice Gants in the

4   *Oort* case.

5          THE COURT:  Which case?

6          MR. ALBANO:  *Oort*, O-o-r-t.  So in that case -- and by

7   the way, this all goes to the plaintiffs' argument that if I

8   throw something in the court file that says I'm innocent, it's

9   not a fair report unless you include it.

10         So for example, we saw the motion to sever.  In the

11  motion to sever, Mr. Wilson made certain claims and actually

12  was arguing, My case is so different, I should be severed.  A

13  claim rejected by the Court.

14         In *Oort*, the plaintiff sues because there was a report

15  that she been arrested for assault and battery of a woman she

16  had a conflict with.  What the published report omitted was

17  that when the police came to her home that morning, the morning

18  of the incident, she was holding an infant in her arms who she

19  said had just awakened, and the car was covered with snow,

20  indicating that she had not been anywhere that day.  Two pretty

21  good exculpatory facts.  And Chief Justice Gants said those

22  exculpatory facts do not need to be included in order to have a

23  fair report.

24         The *Howell* case had something similar.  So poor Mr.

25  Howell has kind of sophomoric pictures on his town computer.

1    The town fires him on charges that they were pornographic

2    materials.  The appeals court said there's a jury issue here.

3    There's no sexual acts depicted.  These are not pornography.

4    And the SJC said, Yeah, it might have been more accurate to say

5    they were sophomoric and other immature photos rather than

6    pornographic, but there was no obligation to do that.  Didn't

7    have to include that exculpatory material in order to get the

8    fair report.

9            There's similar language in the *Crane* case.  This was,

10   the case got cited, Your Honor, in the last brief when we were

11   exploring California law, which everyone agrees is the same.

12   The parties, that is, agree.  There, the argument in *Crane* was

13   that it was exculpatory information that was not included, so

14   it's not a fair report.  And the Court said while the article

15   did not exhaustively present all of the evidence favorable to

16   the plaintiff, it did report their denials, and it did inform

17   the reader that the star witness of the committee was a convict

18   with a rich criminal history.

19           So the denial at the end, as long as one prints that

20   these are the charges and the defendant has denied them, that

21   is sufficient.  The rule that we're addressing here doesn't --

22   and I will next address why the fair report privilege applies

23   to this film.  But I do think it's significant that the rule we

24   are applying here doesn't just apply to these defendants.  This

25   is how local newspapers, local TVs cover crime every day, and

1    they are not required to include a detailed account while the

2    case is pending of the defendant's side.  That's not what the

3    fair report privilege requires.  It's not what *Schiavone* held.

4    *Schiavone* is completely distinguishable from this case.  In

5    *Schiavone*, the publication omitted the government's conclusion

6    that there was no connection to the Hoffa murder.  So *Schiavone*

7    would be applicable here if there was a government finding that

8    there was no crime committed here and it was omitted from a

9    report of the charges.

10           So why does the fair report apply here, Your Honor?

11   It applies here for the same reason in the *Brown* case, it

12   applied to a TV broadcast.  In fact, in *Brown*, that is relevant

13   for two reasons.  We cited both Judge Tauro's District Court

14   decision and the First Circuit decision.

15           THE COURT:  Hold on a second.  I'll see if I have

16   them.  Okay.  I have them.

17           MR. ALBANO:  So this case, there is a pilot whose wife

18   disappeared.  He lived in the same town with the -- I don't

19   know if you remember the wood chipper murderer.  The husband

20   murdered his wife and disposed of the body in a wood chipper.

21           So the plaintiff, his wife has disappeared.  He's not

22   convicted of any crime.  He's not charged with any crime.  They

23   run, Hearst runs a story, The Other Pilot's Wife, juxtaposing

24   the plaintiff's disappearing wife with the wood chipper case.

25   And Judge Tauro held and the First Circuit affirmed the mere

1    juxtaposition in the same broadcast did not for that reason

2    alone defame the plaintiff.  Other portions of the broadcast

3    that were based on divorce proceedings were privileged fair

4    reports.

5           So this is an example, again, this case was affirmed

6    by the First Circuit.  It's an example of what this film does.

7    There are some parts that are privileged fair reports.  It

8    doesn't matter if you are republishing or uttering aloud a

9    transcript that is a court file or any court record.  The fair

10   report privilege of course would not apply, did not apply to

11   any of the people that were interviewed giving their own

12   opinions.  That's not unusual.  Some parts of a publication or

13   broadcast will be privileged.  Other parts will not.  And so

14   there's certainly no --

15          THE COURT:  When you say -- okay.  So some parts can

16   be privileged and some aren't.  And could it be that that

17   opening segment, essentially minutes two to five, could defame

18   Johnny but not defame his father?

19          MR. ALBANO:  No.  Here is why not.  No reasonable

20   viewer can read that -- can watch that film and reasonably

21   conclude that that person is John Wilson Jr., and here is why.

22          There is a pretty big deal made in the movie of the

23   fact that that kid is Devin Sloane's kid, and Singer and

24   somebody else mocked Devin Sloane for doing such an awful job

25   photoshopping that the film does have to be viewed --

1          THE COURT:  If I disagree with you on that, does that

2     mean you lose?  No reasonable person could make that mistake.

3          MR. ALBANO:  Right.  No, it does not mean that I lose

4     because the difference between a falsified athletic profile and

5     a photoshopped picture is not a substantial enough difference

6     to rest a libel claim.

7          THE COURT:  Because I'll tell you, perhaps I'm not the

8     reasonable person, but when I watched that, I thought that John

9     Wilson Sr. was photoshopping in his son.  And then you go to

10    like ten minutes later, and there's a picture of another kid,

11    but there's no connection made.  And I guess you have to look

12    at the report as a whole, but, you know, it's like an hour and

13    20 minutes long.  All right.  Keep going.

14         MR. ALBANO:  On that point, Your Honor, so to answer

15    your question, no, if you disagree with me on that point, it

16    doesn't mean that the motion to remand should be granted.  But

17    I would like to take another run at you, if I can, on this.

18         THE COURT:  Go ahead.

19         MR. ALBANO:  Because cases like *Damon v. Moore* was a

20    film case.  You had to view the film in context.  And what is

21    shown in that film is the photo of the water polo player, yes,

22    it appears during a snippet of a conversation with Wilson and

23    Singer.  It also, right in the same section, appears during a

24    snippet of a conversation with two other defendants.  And then,

25    as I say, when you get to the punch line about the water polo

1  player, there is quite a big deal made, and any reasonable

2  viewer would say that's Devin Sloane's son.

3            THE COURT:  And there's no -- so any reasonable

4  person, so no possibility that you would lose on that.  Okay.

5  You want to keep me off the jury I think.

6            MR. ALBANO:  Well, I would like to circle back,

7  though, to the big picture issue here, and the plaintiffs argue

8  this in their brief, that it is significantly different to say

9  that someone's athletic profile had a photoshopped picture on

10  the one hand and on the other hand to say that that student's

11  athletic profile was falsified and was part of the basis for

12  the student's admission as a water polo player.

13            And I do say that there is no prospect that the

14  Supreme Judicial Court would say, Oh, yes, the substance, the

15  gist and sting of those two charges are different enough to

16  rest a libel claim.

17            THE COURT:  Well, but the question of photoshopping is

18  shorthand for something else that I asked you before, and you

19  addressed it and I need to think about it.  But it's one thing

20  -- you know, is it one thing to say, "You're a water polo

21  player, but you wouldn't have been put on the walk-on recruit

22  list at USC if your father hadn't paid $500,000," and another

23  thing to say, "You're not a water polo player at all.  The

24  record reflects the fact that you are a water polo player,

25  although Judge Gorton said you weren't good enough to make the

1   team if your father hadn't paid $500,000."  And is there a

2   possibility that that would be found to be defamatory and not

3   privileged?  Because, I mean, even Judge Gorton said he was a

4   water polo player, he just wasn't good enough to make the team.

5           MR. ALBANO:  Right.  And so we are comparing, we are

6   saying that the fair report privilege is lost.  It's no longer

7   a rough and ready summary.

8           And the perception of the reasonable reader would be

9   significantly different if we said here is someone who -- what

10  does the film actually say?  For example, if the film stated or

11  implied that John Jr. knew about the alleged bribery or had

12  somehow participated in it, then yeah, I understand where the

13  plaintiff was coming from.

14          But this claim is that there's a material difference

15  between accurately and fairly reporting that the government

16  says, "Your father bribed your way onto the team," and, "A

17  falsified profile was used that got you into school," and they

18  say, "But you didn't say I played water polo in high school."

19  That's not enough.  That's not close to enough to lose the fair

20  report privilege.

21          I was thinking before this argument how would people

22  cover certain trials?  I mean, I thought of General Mike

23  Flynn's trial.  I suppose if I pored through Pacer, he said a

24  lot of stuff, that he was innocent, and if the test is, wait,

25  there's stuff in the file that indicates he might be innocent,

1   then the fair report privilege doesn't serve the purpose that

2   it's intended to serve, which the Supreme Judicial Court has

3   said has constitutional --

4           THE COURT:  Let me ask you this as a general matter.

5   Could the fair report privilege protect Netflix with regard to

6   John Wilson Sr.'s claim and not John Wilson Jr.'s claim?

7           MR. ALBANO:  Not on these facts, no.

8           THE COURT:  Well, conceptually.

9           MR. ALBANO:  Conceptually, if the film said John

10  Wilson Jr. knew about it and participated in it and was a happy

11  participant, then yeah, I could see how Mr. Wilson Sr.'s claim

12  would go out, but John Jr.'s claim would not.  But we're not

13  close to that scenario here.

14          There's no way to report this case without saying that

15  Mr. Wilson was charged with bribing -- essentially, I'm

16  paraphrasing -- bribing John Jr.'s way into the USC water polo

17  team and used a falsified athletic profile to do so.  And that,

18  I do say, ends the case.

19          THE COURT:  Okay.  Hold on just a second.  You've

20  persuaded me and not just because of the time that I'm not

21  going to decide this matter this afternoon at least because

22  there's something that came to my attention today that you

23  haven't had a chance to consider and address.

24          So there are cases that hold that publications are not

25  protected by the fair report privilege or what in some

1    jurisdictions in certain circumstances is called the neutral

2    report privilege, if the publication espouses or concurs in the

3    charges being reported, and one of them is *Cianci*, 639 F.2d 54,

4    at page 69.

5           But maybe this applies more to John Wilson Sr.  Does

6    the film essentially vouch for the accuracy of the charges?

7    Maybe this isn't that pertinent.  Another case is *Quigley*, 327

8    F.3d 1044; *Connaughton,* 842 F.2d 825, 847; *Price,* 881 F.2d

9    1426, 1434.

10          I haven't -- I mean, I'm just thinking out loud.  What

11   are the implications if I were to find that there's a

12   reasonable possibility that a viewer, a reasonable viewer would

13   think that the photoshopped water polo player on the screen,

14   while the re-enactment of a tape-recorded conversation with

15   John Wilson Sr. was being played, that's the audio, that that

16   photoshopped person was John Wilson Jr. and, in the context of

17   the whole program, Netflix was vouching for the accuracy of the

18   allegations as yet untried against John Wilson Sr. because he's

19   lumped in with all the people pleading guilty, who have pled

20   guilty, and you have to watch an hour and 20 minutes before,

21   for a few seconds after, I think, showing him or the person

22   dramatizing him, playing him in the movie, getting arrested,

23   for two seconds or something on the screen it says he pled not

24   guilty, and then it goes to a bunch of people who pled guilty.

25          Is Netflix vouching for the accuracy of the charges?

1    Because he hasn't been tried yet.  And does that eliminate the

2    fair reporting privilege.

3            I don't want to put this down for very long.  Do you

4    want to read those cases and give me your thoughts tomorrow?

5            MR. COOPER:  I'm happy to do that, Your Honor.  I

6    would just say, though, from plaintiffs' perspective, if you

7    were to make that first finding, then upon that finding the

8    case needs to be remanded, and you need not reach the second

9    issue.

10           THE COURT:  That may be right, except -- Mr. Albano

11   eloquently argues the gist is the same, and you emphatically

12   argue that it's not.  But what I'm saying is -- and then if you

13   know, if you both -- if I find you both made possibly

14   persuasive arguments, I have to remand the case I think.

15   There's not clear and convincing evidence that there's no

16   possibility that the plaintiff will overcome, will survive a

17   motion to dismiss in the state court.

18           MR. COOPER:  Your Honor, if you'd like to hear from us

19   on those cases, which I'd be happy to read, I would only ask to

20   have until the end of the day tomorrow because I've got a

21   conflict.

22           THE COURT:  You can have until the end of the day

23   tomorrow.  Is there something you'd like to say in response to

24   Mr. Albano?

25           MR. COOPER:  Very briefly, Your Honor, and forgive me

1     for stating the obvious.  But all of this referral, reference
2     to exculpatory evidence, et cetera, Johnny is not the defendant
3     in the criminal matter.  And we are alleging exactly what
4     Mr. Albano has said would be, if communicated by way of
5     innuendo, outside the fair report privilege, namely, that when
6     you say that Johnny is a fake athlete rather than a real water
7     polo player and you imply that his parents photoshopped and of
8     this, he would have to have been complicit in it and known
9     about it.  He actually was on the water polo team.  He would
10    have to have known that he was completely unqualified to do it
11    and he was a fake.

12           They were suggesting by virtue of the way they filmed
13    this documentary exactly that.  And it is true, Johnny has not
14    been charged with anything.  The government hasn't said that,
15    and I think that that's probably why they were very careful to
16    say "purported water polo player," because that is what's
17    reflected in the record, and Judge Gorton found he was a water
18    polo player.  And the opinion of whether he was good enough is
19    not what the movie presents.  The movie presents that he's a
20    fake, and if he's a fake, he had to have known.

21           MR. ALBANO:  May I just point out that at two minutes
22    and three seconds of the movie, Singer says, "The money goes
23    into my foundation as a donation."

24           Wilson:  "Oh, to the foundation, not to the school."

25           Singer:  "Yeah, then that way the kids don't know it

1    happens, right?"  That is not the only place in the movie where

2    it is -- there is no reasonable suggestion --

3         THE COURT:  Whether he knew or didn't know at the

4    moment to me is not at the heart of the matter.  I think at the

5    heart of the matter is does it make -- well, as always, the

6    definition of the question is very important to the answer.

7    And if this could go either way, the case has to get remanded.

8         And if I remand the case, I'm not making a prediction

9    as to what the state court will do.  You'll make your eloquent

10   arguments to some state court judge.  And if Johnny gets

11   dismissed before I think next April and you want to come back

12   to federal court, I'll see you again.

13        But I think for now, it's after 4:30, which, sometimes

14   we go much later, but I want to reflect on all of the excellent

15   arguments from both sides.  So unless somebody has something

16   else -- actually, let me go in the breakout room with my staff,

17   and I'll be back in a few minutes.

18        (Recess, 4:34 p.m. - 4:40 p.m.)

19        THE COURT:  I am going to take this matter under

20   advisement.  I will either issue a written decision or have you

21   reconvene for a hearing, at which I'll give you my decision

22   orally.  Of course I've got other things to do, too.  And as I

23   said, I hadn't thought through whether the *Cianci* case has any

24   implications for this case, but I haven't had time.  But tell

25   me what you think tomorrow.

1          MR. COOPER:  Your Honor, since you're taking it under

2     advisement, could I push and ask until noon on Friday?  I'm in

3     a deposition all day tomorrow.

4          THE COURT:  All right.

5          MR. COOPER:  Thank you.

6          THE COURT:  Well, okay.  But the train is going down

7     the track.  I planned to work on this tomorrow.  Anyway.  As

8     soon as you can but by noon on Friday is acceptable.

9          MR. COOPER:  Thank you, Your Honor.

10         THE COURT:  All right.  As I say, it may not be

11    material.  Although it's probably not necessary, I'm ordering

12    you to order the transcript of this hearing.  And this probably

13    is going to be ineffectual, but what I will do is order that

14    you confer and let me know whether the defendant has agreed to

15    a remand.  If you want to be -- I've got to think all of this

16    through, and you both sound great, which may be why it needs to

17    be remanded, it could come out either way.

18         But it might be in the defendants' interest if you

19    think there's a reasonable likelihood that when I can decide

20    this I'm going to order it remanded, you may want to go to

21    state court sooner rather than later and try to get an

22    expedited hearing and decision on a fully briefed motion to

23    dismiss Johnny's claims at least.  And then if you get that,

24    the way I read the removal statute, you can come back if you

25    prefer to be in federal court.

1         As I read it, and you'll read it, you'd have to get

2    that decision by next April I think it is.  So why don't you do

3    this.  Why don't you -- do you have any time at all tomorrow to

4    talk to Mr. Albano after he talks to his client?

5         MR. COOPER:  It's always my pleasure to talk --

6         THE COURT:  By the end of the day tomorrow tell me

7    whether the defendants agree to a remand, although I'm going to

8    spend time working on this tomorrow while these cases are fresh

9    in my mind before they get superseded by something else.  Okay.

10         MR. ALBANO:  We will, Your Honor.

11         THE COURT:  Because it would be a reasonable

12    resolution.  And then maybe I'll get to see you again if

13    Mr. Albano is right.  Okay.  I'd like to see everybody,

14    including the court reporter, in the breakout room again.  We

15    will be in recess.  I'd like to see everybody on my staff.  I

16    misspoke.

17         MR. COOPER:  Okay.  Thank you, Your Honor.

18         MR. ALBANO:  Thank you.

19         (Adjourned, 4:45 p.m.)

20

21

22

23

24

25

1                   CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Merit Reporter

4     and Certified Realtime Reporter, in and for the United States

5     District Court for the District of Massachusetts, do hereby

6     certify that the foregoing transcript is a true and correct

7     transcript of the stenographically reported proceedings held in

8     the above-entitled matter to the best of my skill and ability.

9                        Dated this 24th day of August, 2021.

10

11                       /s/ Kelly Mortellite

12                       _____

13                       Kelly Mortellite, RMR, CRR

14                       Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25